**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AMARA  EMUWA
23 Silver Moon Drive
Silver Spring, MD 20904

And

MICHAUX LUKUSA
11600 Stoneview Square
Reston VA 20191

And

MOHAMMED ALQARAGHULI
231 South Picket Street
Alexandria VA 22304

And

FNU ALATANHUA
25 Avalon Drive
Milford CT 06460

and


LOUISE TRAUMA CENTER LLC
1234 Mass Avenue NW
Washington, DC 20005

Plaintiffs


v.                                          Civil Action No. 20-cv-    ( )

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY
4705 Martin Luther King Jr. Ave SE
Washington DC 20528

Defendant

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.   In this FOIA case, Plaintiff Ms. Amara Emuwa seeks a copy of her entire "asylum office assessment." This document is three pages long. Defendant Department of Homeland Security [DHS] will not suffer any harm if it is disclosed.

**THE ASYLUM PROCESS**

2.   A person may be granted asylum in the United States if she has suffered harm in her home country. 8 U.S. C. § 1258.

 3. To win asylum, you must have suffered a great deal of harm. Before asylum is granted, the harm must "rise to the level of persecution." There must be a showing of "severe mistreatment." *Matter of O-F-A-S-,* 27 I&N Dec. 709, 721 (BIA 2019) (being beaten and held in prison for five days is not enough).   In *Morales-Morales v. Sessions,* 857 F.3d 123, 133 (1st Cir. 2017), the applicant was beaten unconscious, had his arm broken, and was hospitalized. Then, he received threatening phone calls. The IJ ruled that this harm did not rise to the level of persecution. In *Gao v. Barr,* 950 F.3d 147, 150 (1st Cir. 2020) the applicant was caught reading a Bible at work. His supervisor called the police; he was arrested and detained for 23 hours, during which time he was threatened and denied food and water. He had to pay a 5,000 yuan fine, and he was fired from his job. Held: this harm does not rise to the level of persecution.

4. Asylum claims "are among the hardest cases faced by our courts. They are not games…We should not forget, after all, what is at stake." *Xue v. Board of Immigration Appeals,* 439 F. 3d 111, 113-14 (2d Cir. 2006).  The "stakes in asylum proceedings are high." *Ren v. Holder,* 648 F.3d 1079, 1086 (9th Cir. 2011). Upon deportation, "the client and his family might well be killed due to circumstances in the client's home country…." *Padilla v. Kentucky,*

559 U.S. 356, 371, n. 11 (2010).  If his application is denied, he may be deported: a "drastic measure," and "a particularly severe penalty." *Sessions v. Dimaya,* 138 S. Ct. 1204, 1213 (2018) (citations and quotations omitted).

5. The asylum applicant can win asylum upon a showing of "severe mistreatment." Staying in the United States, not knowing if you will be deported back to your home country is painful and anxiety-provoking. The Court is asked to keep these considerations in mind as it considers the "harm" that DHS will claim it will suffer. Ms. Emuwa fears deportation, torture, and death in her future. What is the harm in the future for DHS?

6. DHS has several components: one of them is US Citizenship and Immigration Services. [US-CIS]. Inside US-CIS are several divisions; one of them is the Asylum Division. Inside the Asylum Division are several asylum offices. For example, one such office is the Arlington VA Asylum Office.

7. Inside the Arlington office are asylum officers and Supervisory Asylum Officers. [SAOs].  There is 100% supervisory review of asylum decisions.

8.The applicant is interviewed by an asylum officer, who will ask many questions, including "Did you suffer any harm in your country?" The officer then writes a draft decision. The draft is given to a Supervisory Asylum Officer [SAO].

9. The SAO makes the asylum officer re-write the draft, until it is perfect. When it is perfect, the SAO initials it, and returns it to the officer.

10. The initialed decision contains facts, reasons, citations to authorities, and conclusions.

TYPES OF DECISIONS MADE BY AN ASYLUM OFFICE

*Record of Determination*

11a. Some asylum applicants swim across the Rio Grande River and walk into Texas. They are arrested and detained in a nearby facility, and are interviewed within a few days by asylum officers. The officer will ask "Did you suffer any harm in your country?" The decision made for this applicant is titled "Record of Determination." 8 U.S.C. § 235(b)(1). This decision is handed to the applicant. The applicant does not need to make a FOIA request for it.

11b. This decision contains facts, reasons, citations to authorities, and conclusions.

12. DHS suffers no harm after a Record of Determination is disclosed.

*Notice of Intent to Deny*

13. Some applicants enter the United States as students, in the "F-1" category. They might be in this status for years, until they get a B.A. or Ph. D. A student, in good status, who applies for asylum, is interviewed by a local asylum office. The officer will ask "Did you suffer any harm in your country?" The decision made for this applicant is titled "Notice of Intent to Deny." This decision is handed to the applicant. The applicant does not need to make a FOIA request for it.

14. The Notice of Intent to Deny contains facts, reasons, citations to authorities, and conclusions.

15. DHS suffers no harm after a Notice of Intent to Deny is disclosed.

*Notice of Intent to Terminate*

16. Some applicants are granted asylum, but then [at times years later] DHS determines that asylum should be terminated. The asylum office makes a decision titled "Notice of Intent to

Terminate." This decision is handed to the applicant. The applicant does not need to make a FOIA request for it.

17. The Notice of Intent to Terminate contains facts, reasons, citations to authorities, and conclusions.

18. DHS suffers no harm after a Notice of Intent to Terminate is disclosed.

*Assessment to Grant*

19. Some applicants enter the United States on short-term visas, and then fall out of status. A man from Sudan might be given a six-month tourist visa; he arrives, six months goes by; now he is out of status. When he applies for asylum, he is interviewed by an officer, who will ask "Did you suffer any harm in your country?" If asylum is granted, the decision is titled "Assessment to Grant." This is not handed to the applicant; he must make a FOIA request to get it.

20. The Assessment to Grant contains facts, reasons, citations to authorities, and conclusions.

21. The DHS suffers no harm after an Assessment to Grant is disclosed.

22. An Assessment to Grant was disclosed in January 2020; the DHS has not yet suffered any harm resulting from the disclosure.

*Assessment to Refer*

23. Using the same example of the man from Sudan, *supra,* if the decision of the office is to deny asylum, the decision is titled "Assessment to Refer."         The Assessment to Refer contains facts, reasons, citations to authorities, and conclusions. This is not handed to the applicant; he must make a FOIA request for it.

24. DHS suffers no harm after an Assessment to Refer is disclosed.

25. The DHS used the Assessment to deport an asylum applicant named Singh in *Singh v. Gonzales*, 403 F.3d 1081, 1087 (9th Cir. 2005). The Court attached a copy of the Assessment as an Appendix to its decision. [It is also attached to this complaint as Exhibit 1.]  The DHS did not file a motion to seal the record, so that the public would not see the Assessment. After the decision was published, the DHS did not ask the Court to delete the Assessment so that no one could read it.

26. During the past 15 years, the DHS has not suffered any harm from that Assessment being published for the world to see.

27. An Assessment to Refer was disclosed in January 2020; this event has not yet caused DHS to suffer any harm.

28.      Plaintiff Ms. Amara Emuwa is in this group: she seeks her Assessment to Refer.

*The Four Brothers*

29. Assume there are four brothers. Each of them lived in the same house, in the city of Khartoum, in Sudan, for their entire lives before arriving in the United States. Each brother protests against the government of Sudan; as a result, each is imprisoned for 12 months and beaten often. Each arrives in the United States on the same day. The first brother swims across the Rio Grande River; is detained, he tells the officer he was imprisoned for 12 months; this

brother is handed the decision of the office. The second brother arrives as a student; he is in good status; he tells the officer he was imprisoned for 12 months; this brother is handed a decision of the office. The third brother arrives as a tourist; after falling out of status, he tells the officer he was imprisoned for 12 months; he is granted asylum; years later, the asylum office decides that his asylum should be terminated; he is handed a decision of the office.

30. The fourth brother arrives as a tourist; after falling out of status, he tells the officer he was imprisoned for 12 months; he is not granted asylum; he is *not* handed a decision.

31. Why is the fourth brother treated differently?  DHS has never explained why three brothers get written decisions, and one does not.

32. When the fourth brother goes to Immigration Court, his own lawyer will ask him: "Did you suffer any harm in your country?"  The Immigration Judge will make a decision. That decision will contain facts, reasons, citations to authorities, and conclusions. That decision will be given directly to the brother. No need for a FOIA.

33. The fourth brother may appeal to the Board of Immigration Appeals [BIA]. That court will make a decision that contains facts, reasons, citations to authorities, and conclusions. That decision will be given directly to the brother. No need for a FOIA.

34. The fourth brother may next appeal to a Circuit Court of Appeals. That court will make a decision that contains facts, reasons, citations to authorities, and conclusions. That decision will be given directly to the brother. No need for a FOIA.

35. The fourth brother was not given the decision of the asylum office; but he was given the decision of the Immigration Judge, the BIA, and the Circuit Court of Appeals. Why the difference? DHS has never explained why.

THE PROCESS FOR WRITING THE INITIALED ASSESSMENT TO REFER

36. Each of the named plaintiffs was an "out-of-status" applicant. The next paragraphs describe how the Assessment for each of the named plaintiffs was created:

37. The "out-of-status"-asylum applicant is interviewed by an asylum officer, who then writes a draft decision, titled "Assessment." The Assessment is given to a Supervisory Asylum Officer [SAO].

38. The SAO makes the asylum officer re-write the Assessment, until it is perfect. When it is perfect, the SAO initials it, and returns it to the officer.

39. The initialed Assessment sets forth the facts of the case, and the decision of the asylum office to grant asylum, or to deny asylum. If the case is denied, the applicant gets a second chance in immigration court. [But, in that court, the DHS can use the Assessment to point out inconsistencies and to argue against a grant of asylum]

40. Only two people at the asylum office are involved in the Assessment: the officer and the SAO.

41, The initialed Assessment is the final decision of the US CIS.

42. The assessment was a recommendation, until it was initialed by the SAO. At that moment, it was no longer a recommendation. The FOIA requests of plaintiffs are for the initialed assessments.

43. The initialed assessment is not a recommendation.

44. After the Assessment is initialed, no one else makes any further effort to examine, decide or determine anything. The decision process has ended. The USCIS has made its decision.

45. After the Assessment is initialed, no one else in the asylum office reads it.

46 The SAO does not seek the approval of anyone; the SAO does not send or forward it to anyone except to the asylum officer.

47. The initialed Assessment does not contain any discussion or exchange of ideas.

48. It does not contain any give-and-take. It does not state or reveal any communication between the officer and his SAO. It does not contain a consultation; if anyone consulted with anyone inside the asylum office, that event is not reflected in the assessment.

49. The initialed Assessment does not contain any policies.

50. The initialed Assessment does not contain any subjective, personal thoughts. It does not contain any proposals, opinions, or recommendations.

51. It will be used by the agency in its dealings with the public.

52. It will be used by the agency in immigration court and in appellate courts.

53. When the DHS releases assessments to judges, there is no confusion.

54. The public is not confused when it reads assessments.

55. The DHS uses assessments in court to deport asylum applicants.

56. This document may be used against her in immigration court, by DHS. There is no discovery in immigration court. This allows DHS to surprise and ambush applicants, by springing documents upon them in that court. So, failure to disclose could cause real harm- deportation- to Ms. Emuwa. It is unfair for the DHS to ambush an asylum applicant in court by surprising her with her assessment. It is wrong for DHS to resist disclosure now, while reserving the right to spring the document upon Ms. Emuwa at a later time.

57. The DHS never uses Referral Notices in court as a way to deport applicants.

58. The SAO initials the perfected Assessment, and returns it to the asylum officer. The asylum officer prepares a Referral Notice, by checking boxes on a computer. The computer creates the Referral Notice, which states in general terms why asylum was denied. It states no facts and cites no authorities.

59. Only one person at the asylum office is involved the creation of the Referral Notice: the asylum officer. The officer creates this Notice, sitting at his own desk, at his computer. No one else at USCIS is involved.

60. The Referral Notice, created by a computer, contains boilerplate. It is not a decision. It is a piece of paper informing the applicant of a previous decision.

ASSESSMENT VERSUS "RECORD OF DETERMINATION"

61. There is no important difference between the Assessment and the Record of Determination.

62. The Assessment contains facts, reasons, citations to authorities, and conclusions. The Record of Determination contains facts, reasons, citations to authorities, and conclusions.

63. Asylum officers are given training materials that state they are to use templates when they write assessments and Records of Determination. They are instructed that a long list of people have access to both documents. They are instructed that the components of both documents are the same.

64. Even though these documents have the same content, the DHS routinely discloses Records of Determination, but, for the last 15 years, the DHS has been withholding the Assessments.

65. During the past 25 years, the DHS has disclosed thousands and thousands of Records of Determination. During this time period, the DHS suffered no harm.

ASSESSMENT VERSUS "NOTICE OF INTENT TO DENY"

66. There is no important difference between the Assessment and the Notice of Intent to Deny.

67. The Assessment contains facts, reasons, citations to authorities, and conclusions. The Notice of Intent to Deny contains facts, reasons, citations to authorities, and conclusions.

68. Asylum officers are given training materials that state they are to use templates when they write assessments and Notices of Intent to Deny. They are instructed that a long list of people have access to both documents. They are instructed that the components of both documents are the same. They are instructed on one page, entitled *Components of an Assessment/NOID,* that the components of both documents are identical.

69. Even though these documents have the same content, the DHS routinely discloses Notices of Intent to Deny to the applicant, but, for the last 15 years, the DHS has been withholding the Assessments.

70. The DHS not only discloses the Notices of Intent to Deny, the DHS gives the applicant 13 days to file a rebuttal.

71. During the past 25 years, the DHS has disclosed thousands and thousands of Notices of Intent to Deny to applicants. During this time period, the DHS suffered no harm.

ASSESSMENT VERSUS "NOTICE OF INTENT TO TERMINATE"

72. There is no important difference between the Assessment and the Notice of Intent to Terminate.

73. The Assessment contains facts, reasons, citations to authorities, and conclusions. The Notice of Intent to Terminate contains facts, reasons, citations to authorities, and conclusions.

74. Asylum officers are given training materials that state they are to use templates when they write assessments and Notices of Intent to Terminate. They are instructed that a long list of people have access to both documents. They are instructed that the components of both documents are the same.

75. Even though these documents have the same content, the DHS routinely discloses Notices of Intent to Terminate, but, for the last 15 years, the DHS has been withholding the Assessments.

76. The DHS not only discloses the Notices of Intent to Terminate, the DHS gives the applicant several days to file a rebuttal.

77. During the past 25 years, the DHS has disclosed thousands and thousands of Notices of Intent to Terminate to applicants. During this time period, the DHS suffered no harm.

ASYLUM APPLICANTS HAD SOME RIGHTS TAKEN AWAY IN 1997

79. 8 C.F.R. § 208.12(a), as of 1996, provided that officers may rely on material from outside, "credible" sources. It also provided that:

> Prior to the issuance of an adverse decision made in reliance upon such material, that material must be identified and the applicant must be provided with an opportunity to inspect, explain, and rebut the material, unless the material is classified under E.O. 12356.  [*see* 62 FR 10312 (3/6/97).]

80. § 208.12(a) was amended in 1997: it no longer requires that any material be identified; it no longer requires that the applicant be allowed to inspect, explain, or rebut the material.

81. After 1997, and currently, an officer may rely upon material *not disclosed* to the applicant. The applicant is no longer able to inspect, explain, or rebut that material. The applicant has no idea what sources and materials were considered by the officer.

82. Asylum officers now may rely upon materials not available to the applicant

83. 8 C.F.R. section 208.12(a), [2011] entitled *Reliance on information compiled by other sources,* states that the asylum officer may rely on material from the Department of State "or other credible sources, such as international organizations, private voluntary agencies, news organizations, or academic institutions."

84. 208.12 (b) provides) provides:

Nothing in this part shall be construed to entitle the applicant to conduct discovery directed toward the records, officers, agents, or employees of the Service, the Department of Justice, or the Department of State. Persons may continue to seek documents available through a Freedom of Information Act (FOIA) request pursuant to 8 CFR part 103.

85.  After the interview, the asylum officer is permitted, and encouraged, to do his own research and fact-finding. The officer is not bound by Fed. R. Evid. 201(b) which refers to facts capable of accurate determination by resort to "sources whose accuracy cannot reasonably be questioned." Whatever facts, theories, or inferences garnered by the officer are put into the Assessment without notice to the applicant. The applicant is not given any opportunity to rebut such facts or inferences.

86. The asylum officer is not required to give a citation to the record in support of an asserted fact. Local Civil Rule 7(h) is not binding on the officer. *See* Perry *v. Shinseki*, 783 F. Supp. 2d 125, 131 (D.D.C. 2011). He is not required to create and establish a record.

87. The asylum officer is not constrained by Fed. R. Civ. P. 56(c) (The "party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record").

88. Asylum officers may rely on information from "credible sources." Which sources are credible, and which are not? Applicants would like to know, so they can cite or not cite from them. If a source is deemed not credible, an applicant may be able to convince an officer to change his mind, and accept information from it.

89. The DHS will not suffer any harm if applicants find out what sources are

deemed credible by officers and what sources are not.

90. The DHS will benefit if it reveals what sources are deemed credible, because then applicants will cite from them more often.

91. If applicants know what sources are good, they can tailor their own research accordingly.

92. The Assessment may contain errors. In that event, the applicant will be very surprised in court. It is unfair to the applicant to be taken by surprise in court, by use of a statement written by someone else. When a serious mistake is made in the Assessment, the applicant might be able to resolve it informally or at a pre-trial conference. The Immigration Judge, no doubt, would prefer that the parties solve such a problem themselves. If not, applicant could issue a subpoena for the Officer and SAO, so the alien can cross-examine him in Immigration Court. The Officer might admit he made a mistake; or, the Immigration Judge might conclude that the Officer made a mistake.

93. The DHS will not suffer harm if it finds out an Assessment contains an error.

94. The DHS will benefit is errors are revealed, because then future errors can be reduced. If the same errors are made repeatedly, the DHS could do targeted training to help the officers and the SAOs.

95. The alien needs to know several weeks before the court hearing about the need for a subpoena, in order to get it served. The Immigration Judge will want to

know how long a hearing might take, and which witnesses will testify. Disclosure of the Assessment will benefit the Immigration Judge hearing the case, and will benefit the Immigration Court as well.

ASSESSMENTS WERE DISCLOSED TO APPLICANTS FROM 1998-2005

96.During the time period 1998- to 2005, the DHS routinely disclosed Assessments to FOIA requesters.  During this time period, the DHS suffered no harm.

97. During this time period, DHS did not conduct any studies or analyses concerning the effect of these disclosures.

98. The DHS changed its policy and stopped disclosing Assessments to FOIA requesters. This happened in the year 2005.

99.  DHS has never given an explanation to the public for this change of policy. In response to FOIA requests, the DHS has not disclosed any studies, investigations, or analyses concerning this change.

100. DHS did not change its policy because it believed that disclosure would cause it harm.

101. From 2008 to the present, the DHS discloses Notices of Intent to Deny to applicants, without being asked. The applicant does not need to hire a lawyer, nor to file an application to get the document; the

applicant is just given it.

102. However, from 2008 to the present, the DHS resists disclosing entire Assessments to applicants, even if the applicant files a FOIA request, hires a lawyer, and files a lawsuit.

103. The DHS has never explained why one class of applicants is treated generously, and is allowed the right of rebuttal, and why the other class is subjected to ambush in immigration court.

104. In response to FOIA requests, the DHS has not disclosed any studies, investigations, or analyses concerning its policy of disclosing one kind of decision but not the other.

"AFFIRMATIVE" ASYLUM VERSUS "DEFENSIVE" ASYLUM APPLICATIONS

105. Plaintiff Ms. Amara Emuwa was not under the jurisdiction of the Immigration Court when she made her asylum application. So, she made an "affirmative asylum application." Her claim was rejected by the Asylum Office; she and her application were referred to Immigration Court. In that court, her application keeps the title of "affirmative asylum application."

106. Other people are already in Immigration Court. Then and there, for the first time, they make an asylum application. They never see an asylum officer; there is no "interview;" no office writes an Assessment. These people make a "defensive asylum application."   Thus, the Immigration Court considers affirmative asylum cases and defensive cases.

107, Immigration Court is part of the Executive Office for Immigration Review [EOIR] which is part of the Department of Justice.

108. EOIR publishes statistics concerning "affirmative asylum applications," that it adjudicates. For FY 2018, the EOIR received 48, 862 affirmative asylum applications," which had been rejected by the asylum office. There is an assessment in each one of these cases.

109. For FY 2019, the EOIR received 62,015" affirmative asylum applications," which had been rejected by the asylum office. There is an assessment in each one of these cases.

INITIALED ASSESSMENTS ARE DISCLOSED IN COURT AGAINST APPLICANTS, AT TIMES

109. When an asylum office rejects an asylum application from an out-of-status applicant, the office issues a Notice to Appear, that orders the applicant to appear in Immigration Court.

110. At this time, the notes of the asylum officer and the initialed Assessment are in the file of applicant. The entire file is delivered to U.S. Immigration and Customs Enforcement [US-ICE], another component of DHS. A lawyer from ICE will go to Immigration Court and argue that asylum should be denied, and that the applicant should be deported.

111. The ICE lawyer has the notes of the asylum officer and the initialed Assessment in his file. He can use them, at his discretion. There is no discovery in Immigration Court. The ICE has no duty to inform the applicant, in advance of the hearing, as to whether or not he will use the documents.

112. The ICE lawyer can surprise the applicant. The ICE lawyer can ambush the applicant.

113. The asylum office does not send the notes and Assessment to the Immigration Court.

114. Thus, when the immigration court hearing begins, the ICE lawyer has documents in his file that are NOT in the file of applicant's lawyer and which are NOT in the court file.

115. The Board of Immigration Appeals has recognized that evidence of what was said under oath during an asylum interview, may be considered by an immigration court. *In re R-S-J-*, 22 I&N Dec. 863, 872 (BIA 1990) ("It may be necessary to present the testimony of the asylum officer before the Immigration Court, together with notes and other evidence of what was said under oath.")

116. Initialed Assessments have often been relied upon by appellate courts. For example, see:

> *Sinani v. Holder,* 418 Fed. Appx. 475, (6th Cir. 2011). *Kudryashov v. Holder,* 492 Fed. Appx.734, (9th Cir. 2012). *Sacko v. Holder,* 510 Fed. Appx.409, (6th Cir. 2013). *Yu v. Holder*, 693 F.3d 294, 296 (2d Cir. 2012).

117. In *Kudryashov,* the Department of Justice mentioned the word "assessment" 12 times in its brief; the Ninth Circuit mentioned the word 11 times.

118. An Assessment may have significant repercussions for a plaintiff if it is used in his immigration proceeding. An Assessment has a potential significant impact on plaintiff's immigration status.

119. The Court can take judicial notice that busy asylum offices will, from time to time, make mistakes. The Eleventh Circuit noted an error in an Assessment in *Ido v. U.S. Att'y Gen.,* 480 Fed. Appx. 972, (11th Cir. 2012) (the year of the first arrest was written down in error).

120. In *Song v. Whitaker,*  750 Fed. Appx, 1, 3 (2d Cir 2019) the applicant told the Judge that the notes of the asylum officer were wrong; "but the IJ was not required to credit" this claim. [the IJ believed the applicant told the asylum officer that four men and a woman came to his home, whereas in court he said it was three men and two women.]

121. From the year 2006 to the present, the DHS has often given entire Assessments to immigration judges and appellate courts. This disclosure did not cause any harm to DHS.

122. The DHS believes it is fair to surprise an asylum applicant in court by using the entire Assessment against him.

123. The DHS often tells judges that Assessments are reliable and probative documents, that reveal truth. The DHS is not embarrassed by the fact that it refuses to

disclose Assessments to FOIA requesters before trial, but it springs Assessments upon applicants in the middle of immigration proceedings.

124. The DHS does not allow itself to be ambushed in court by previously undisclosed documents. If a litigant attempted to surprise the DHS in court, the DHS would object.

125. The DHS does not suffer any harm when Assessments are disclosed to judges. Applicants at times suffer great harm: they get deported.

126. There is no discovery in immigration court.

127. The Third Circuit criticized the DHS for delaying cases, in Totimeh v. Att'y Gen., 666 F.3d 109, 112, note 3 (3d Cir. 2012). In that case, which did not involve an Assessment, the DHS refused to furnish documents, and insisted that Totimeh file a FOIA to get them. After a long delay, Totimeh obtained the documents, but the Third Circuit stated "It is strange that the Government did not provide this information to Totimeh or the IJ at the time the former asserted his correct admission date, and instead forced him to seek out the documents through a FOIA request. This resulted in unnecessary delay, an additional written decision by the BIA, and an additional appeal to us. We expect that the Government will respond (and quickly) in the future with such information in similar circumstances."

128. From 2006 to the present, the DHS has not suffered any harm resulting from its disclosure of Assessments to judges.

129. The DHS used the Assessment to deport an asylum applicant named Singh in *Singh v. Gonzales*, 403 F.3d 1081, 1087 (9th Cir. 2005). The Court attached a copy of the Assessment as an Appendix to its decision. [It is also attached to this complaint as Exhibit 1.]  The DHS did not file a motion to seal the record, so that the public would not see the Assessment. After the decision was published, the DHS did not ask the Court to delete the Assessment so that no one could read it.

130. During the past 15 years, the DHS has not suffered any harm from that Assessment being published for the world to see.

131. From 2006 to the present, the DHS has not conducted any studies, investigations or analyses concerning harm that may result from disclosure of Assessments to judges.

132. From 2006 to the present, the DHS has instructed asylum officers that the applicant may later read his entire Assessment. During this time period, asylum officers had no expectation of privacy, concerning Assessments.

133. From 2006 to the present, DHS has disclosed thousands of NOIDS to asylum applicants. This disclosure did not, and does not, harm DHS.

EVEN MINOR INCONSISTENCIES CAN BE FATAL

134. The BIA stated that "even minor inconsistencies can be considered…." *Matter of Y-I-M-,* 27 I&N Dec. 724, 731 (BIA 2019).

135. In *Cojocari v. Sessions,* 863 F.3d 616, 622 (7th Cir.2017) the applicant testified in court in 2013. The IJ denied asylum, in part because of these inconsistencies:

-applicant's asylum application said he was released from the hospital on July 2, 2007. But in court he said it was on July 7th.\;

-he said another hospital stay ended on November 6, 2009; but his passport showed he traveled on November 5th; so, he then said the hospital stay ended on November 5th;

-his asylum application said he stayed with in-laws for "two to three months" but in court he said it was for "about a month and a half."

136. The DHS offered an Assessment into evidence at the conclusion of the applicant's case in Abdramane v. Holder, 569 Fed. Appx. 430, 434 (6th Cir. 2014). Counsel for applicant objected, but the Immigration Judge admitted it anyway.

JILL EGGLESTON DECLARATION September 20, 2018

137. ¶ 10 of her declaration describes the harm that the agency will suffer if entire assessments are disclosed:

"Public disclosure of the withheld information will lead to asylum applicants tailoring their applications and interview responses to what they believe will tip an asylum officer's decision in their favor. Public disclosure of the asylum officer's deliberative process will hinder the Agency's ability to make determinations solely on the merits of an asylum claim."

[A168-69  *Kapende v. DHS,* Case No. 19-5080]

ASYLUM OFFICERS HAVE NO EXPECTATION OF PRIVACY

138. Asylum officers are instructed and trained that Assessments shall later be read and used by "a number of persons," including the "applicant and his or her attorney.... [ The applicant and his attorney] "may submit a Freedom of Information Act [FOIA]

request to obtain a copy of any assessment (and other information in the file)." *See* page 11 of *Decision Writing Part I,* dated June 21, 2004.

139. Asylum officers know that Assessments can later be made public. They do not have fear of publicity, they have knowledge of it. Assessments are quoted from in decisions published by federal courts. Officers expect public dissemination of their remarks.

140.  DHS stated at its website that Assessments are available via FOIA: "The applicant and his or her attorney...may submit a Freedom of Information Act (FOIA) request to obtain a copy of an Assessment..."

www.uscis.gov/sites/default/files/USCIS/Humanitarian/Refugees 66Äsylum/
Asylum/AOBTCLessonPlans/ Decision-Writing-Part-1-Overview- Components-
31aug10.pdf

141. The DHS publishes an Affirmative Asylum Procedures Manual, available online. It states: "Nevertheless the Asylum Officer's Assessment may be disclosed to the applicant in response to a FOIA request..."

142. Louise Trauma requested "all asylum officer lesson plans, materials, instructions, and guidance used during the class for new officers July 2019" months ago. COW 2019-500-784. DHS has not yet responded.

**TRAINING GIVEN TO FOIA PROCESSORS AT DHS IN 2015**

143a. DHS gave instructions, guidance, and training to its FOIA processors in the year 2015.

143b. An agency is instructed to "provide in its declaration and *Vaughn* index precisely tailored explanations for each withheld record at issue." *Nat'l Sec. Counselors v. CIA,* 960 F. Supp. 2d 1001, 188 (D.D.C. 2013).

144. During 2015, DHS trained its FOIA processors that a document could be "deliberative" if one of these three factors were present: 1] Release could cast a chilling effect upon open, frank and honest discussions on matters of policy between subordinates and superiors; 2] Release could cause premature disclosure of proposed policies before they are finally adopted; 3] Release could cause public confusion that might result from disclosure of reasons and rationales that were not in fact ultimately the agency's action..

145. That training is quite similar to what judges have said. For example, in *Judicial Watch v. Dep't of Army,* 466 F. Supp. 2d 112, 120 (D.D.C. 2006) the court stated:

> The three specific policy objectives underlying this privilege are: (1) to encourage open, frank discussions on matters of policy between subordinates and superiors; (2) to protect against premature disclosure of proposed policies before they are finally adopted; and (3) to protect against public confusion that might result from disclosure of reasons and rationale that were not in fact ultimately the grounds for an agency's action.

146. It is obvious to the casual reader that the 2015 instructions, set forth in ¶ 144, are almost identical to words in *Judicial Watch* case, decided in 2006.

147. On June 30, 2016 President Obama signed into law the FOIA Improvement Act of 2016.

148. *Before* this signing, the deliberative process privilege was given a "narrow scope." *Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d 854, 868 (D.C. Cir. 1980). "We reemphasize the narrow scope of Exemption 5 and the strong policy of the FOIA that the public is entitled to know what its government is doing and why. The exemption is to be applied 'as narrowly as consistent with efficient Government operation.' S.Rep.No. 813, 89th Cong., 1st Sess. 9 (1965)." *Id.*

149. After the signing, this privilege was given an even more narrow scope.

THE FOIA IMPROVEMENT ACT OF 2016

150. The FOIA Improvement Act of 2016 added a new sub-section:

5 U.S. C. § 552 (a)(8)(A) provides that, even if a record is otherwise exempt, the agency shall withhold "only if" the agency "reasonably foresees that disclosure would harm to an interest protected by an exemption…"

151. In *Center for Investigative Reporting v. US. DOJ,* 2020 U.S. Dist. LEXIS 61201 *9 (D.D.C. April 7, 2020) the Court said this new sub-section creates "a heightened standard." To satisfy its obligations, the agency must "articulate both the nature of the harm and the link between the specified harm and specific information contained in the material withheld." *Id.* [citations omitted].

**TRAINING GIVEN TO FOIA PROCESSORS IN 2017-2020**

152. During the years 2017-2020, FOIA processors at DHS were trained that:

"Even when an exemption broadly applies, however, an agency nevertheless must 'tailor' its withholdings to only that which the exemption protects.  Inst. for Justice v. IRS, 941 F.3d 567, 574 (D.C. Cir. 2019)." *Long v. Immigration & Customs,* 2020 U.S. Dist. LEXIS 96468, *20-21 (D.D.C. June 2, 2020)

153. During the years 2017-2020, FOIA processors at DHS were trained that:

"specifically, three types of harm have consistently been held to constitute a basis for withholding under the deliberative process privilege, if release would:

-Cast a **chilling effect** upon open, frank, and honest discussion on matters of policy between subordinates and superiors; or

-**Cause premature disclosure** of proposed policies before they are actually adopted; or

-Cause public **confusion** that might result from disclosure of reasons and rationales that were not in fact ultimately the grounds for the agency's action."

[**bold** in the original] See Exhibit 6, attached hereto.

154. During the years 2017-2020, the FOIA processors were also trained and instructed that:

**Deliberative Process-**

**Three Kinds of Harm (three C's):**

1. Release could cast a chilling effect upon open, frank, and honest discussions on matters of policy between subordinates and superiors;
2. Release could cause premature disclosure of proposed policies before they are finally adopted; (Cat out of the bag)
3. Release could cause public confusion that might result from disclosure of reasons and rationales that were not in fact ultimately the agency's action..

[**bold** in original]

*See* what is marked as page "178" in Exhibit 6, attached hereto.

155. It is obvious to the casual reader that the "Three C's" are almost exactly the

same as the instructions given in the year 2015, set forth in ¶ 222 in this Complaint.

156. Training given in 2017 was substantially the same as in 2015.

157. Training given, and still being given, is insufficient.

158. DHS has a duty to give accurate training to its processors concerning changes in the law.

159. DHS has violated the applicable standard of care.

160. DHS deviated from this standard of care by not providing its processors with accurate training concerning the current law.

161. Because of this violation, all plaintiffs have suffered harm

162. DHS did not meaningfully update its training after the enactment of the FOIA Improvement Act.

163. DHS did not, and still has not, trained its processors in accord with the teachings of Center *for Investigative Reporting v. US. DOJ,* 2020 U.S. Dist. LEXIS 61201 *9 (D.D.C. April 7, 2020).

164. "Approximately half of responding agency FOIA staff reported that they do not receive adequate FOIA training. Of those respondents who found FOIA training to be inadequate, the main reasons they gave included that: (i) no training at all was received; (ii) the training received needed more subject matter content and detail; …"Page 15 of the Draft Report of the FOIA  Federal Advisory Committee     [May 19, 2020]

165. On June 17, 2019, in response to a FOIA request about the training of FOIA processors, the DHS released 1, 321 pages. Undersigned counsel read each one of those pages.

166. Of those 1, 321 pages, very few mention harm. The pages that mention harm are part of Exhibit 6.

167. There is no further training in those pages, concerning harm.

168. Those pages *lack* many concepts and points about harm.

169. Those pages lack any instruction, guidance, or training about:

> The legislative history of the 2016 amendments makes clear that agencies must determine whether the release of "particular documents" will cause foreseeable harm, not simply generic categories of records (e.g. all draft documents.

> FOIA professionals should examine individual records with an eye toward determining whether there is foreseeable harm from release of "that particular record."

> Each record should be reviewed by agencies for its content, and the actual impact of disclosure for that particular record, rather than simply looking at the type of document or the type of file the record is located in.

> Thus, for example, a requested record might be a draft, or a memorandum containing a recommendation. Such records might be properly withheld under Exemption 5, but that should not be the end of the review. Rather, the content of that particular draft and that particular memorandum should be reviewed and a determination made as whether the agency reasonably foresees that disclosing that particular document, given its age, content, and character, would harm an interest protected by Exemption 5. In making these determinations, agencies should keep in mind that mere "speculative or abstract fears" are not a sufficient basis for withholding.

OTHER FOIA REQUESTS ABOUT HARM

169.  In DHS Appeal Number 2019-HQAP-00405, Catholic Charities requested all "studies, analyses dated between 1-1-18 and 4-2-19 concerning "harm" that would result if Exemption (b)(5) records were released. DHS labeled this request as "2019-HQFO-00565." You released 159 pages. But, not even one study or one analysis was released.

==

170. Louise Trauma Center requested all records concerning training given to CRCL program officers about the FOIA Improvement Act of 2016.  2019-GQFO-01250. The agency released 15 pages, none of which mentioned "harm." Louise Trauma appealed. The agency noted that Louise Trauma asserted that "There must be more pages," and that CRCL "must have some documents which address the meaning of harm." The agency disagreed and denied the appeal. 2020-HQAP-00028.

STUDIES ABOUT HARM

171. Louise Trauma requested "all studies, analyses, memoranda, information, instructions, reports, and documents concerning the harm stated in the FOIA Improvement Act of 2016, dated 1-1-16 to the date you begin to process this request."  COW 2019501784

172. No studies have been released.

173a. Louise Trauma requested all records concerning studies, analyses, research about harm, January 1, 2015 to the date you begin to process this request.  COW 2020 000 446.

173b. Louise Trauma made a similar request to Department of Justice in May 2020: EMRU FOIA 050420

173c. Louise Trauma made a similar request to DHS: "2020-HQFO-01049."

173d. Louise Trauma made a similar request to DHS: COW 2020 000 569.

174. No studies have been released.

## JURISDICTION

175. This Court has both subject matter jurisdiction over this action and personal jurisdiction over Defendant pursuant to 5 U.S.C. § 552(a) (4) (B) and 28 U.S.C. § 1331. This Court has jurisdiction to grant declaratory and other necessary relief pursuant to 28 U.S.C. § 2201-02.

## VENUE

176. Venue is appropriate under 5 U.S.C. § 552(a) (4) (B), and 28 U.S.C. § 1391, because defendant is located in the District of Columbia.

## PARTIES

*Ms. Emuwa*

177. Ms. Amara Emuwa was born in Nigeria in 1969 and seeks asylum in the United States.

178. She is a member of the Ibo ethnic group; she suffered domestic violence. She is a member of the Christian religion. She arrived in the United States in July 2017. She has a Ph.D.

179. She was interviewed by the Arlington Asylum Office in June 2018.  The asylum officer who interviewed her no longer works at that office. The Supervisory Asylum Officer who initialed the assessment no longer works at that office.

180. An Assessment was written about her case in June 2018.

181. That assessment is now in the file held by a DHS lawyer, who has an office at 1901 South Bell Street, Arlington, VA. That lawyer can read the entire assessment. That lawyer believes that the entire assessment is admissible in any hearing at Immigration Court. That

lawyer believes the entire assessment is relevant and probative. There is no discovery in Immigration Court.

182. Louise Trauma Center LLC and Ms. Emuwa made a "third party" request for her entire assessment in March 2020.

183. DHS, acting through Ms. Jill Eggleston, disclosed part of the assessment, but not all of it.

184. Ms. Eggleston provided some explanation, but did not claim DHS would suffer any harm if the entire assessment were disclosed. *See* Exhibit 2.

185. Ms. Eggleston did not consider harm, and did not mention harm in her explanation.

186. Plaintiffs made an administrative appeal, and argued that DHS would not suffer any harm if the entire assessment were disclosed. Plaintiffs wrote: "**Your [decision]letter does not mention the word 'harm.'**    A**t** some later time, are you planning to claim that the agency will suffer harm? If you fear harm, you should inform us now. How can we appeal without this information?

187. DHS, acting through Mr. Alan Hughes, denied the administrative appeal, and did not release the entire assessment.

188. Mr. Hughes provided some explanation, but did not claim that DHS would suffer any harm if the entire assessment were disclosed.

189. Mr. Hughes did not consider whether or not DHS would suffer any harm if the entire assessment were disclosed.

190. Plaintiffs have exhausted all administrative remedies.

*Mr. Lukusa*

191. Mr. Michaux Lukusa was born in the Democratic Republic of Congo in 1975. He is a Christian, and a member of the Luba ethnic group. He has an anti-government political opinion. He arrived in the United States in August 2015.  He seeks asylum in the United States. He was interviewed by the Arlington asylum office in July 2019. The asylum officer who interviewed her no longer works at that office. The Supervisory Asylum Officer who initialed the assessment no longer works at that office.

192. An Assessment was written about his case in July 2019.

193. That assessment is now in the file held by a DHS lawyer, who has an office at 1901 South Bell Street, Arlington, VA. That lawyer can read the entire assessment. That lawyer believes that the entire assessment is admissible in any hearing at Immigration Court. That lawyer believes the entire assessment is relevant and probative. There is no discovery in Immigration Court.

194. Louise Trauma Center LLC and Mr. Lukusa made a "third party" request for his entire assessment in March 2020.

195. DHS, acting through Ms. Jill Eggleston, disclosed part of the assessment, but not all of it.

196. Ms. Eggleston provided some explanation, but did not claim DHS would suffer any harm if the entire assessment were disclosed. *See* Exhibit 3.

197. Ms. Eggleston did not consider harm, and did not mention harm in her explanation.

198. Plaintiffs made an administrative appeal, and argued that DHS would not suffer any harm if the entire assessment were disclosed. Plaintiffs wrote: "**Your [decision]letter does not mention the word 'harm.'**   **A**t some later time, are you planning to claim that the agency will

suffer harm? If you fear harm, you should inform us now. How can we appeal without this information?"

199. DHS, acting through Mr. Alan Hughes, denied the administrative appeal, and did not release the entire assessment.

200. Mr. Hughes provided some explanation, but did not claim that DHS would suffer any harm if the entire assessment were disclosed.

201. Mr. Hughes did not consider whether or not DHS would suffer any harm if the entire assessment were disclosed.

202. Plaintiffs have exhausted all administrative remedies.

*Mr. AlQaraghuli*

203. Mr. Mohammed AlQaraghuli was born in Iraq in 1989 and is a liberal Muslim. He has an anti-government political opinion; he favors democracy and Western values. His father is "Shia;" his mother is "Sunni."  He entered the United States in January 2013.

204. He was interviewed by the Chicago asylum office in August 2014; the officer who interviewed him no longer works at that office. The SAO who initialed the assessment no longer works at that office.

205. His Assessment was written in January 2017.

206. That assessment is now in the file held by a DHS lawyer, who has an office in Arlington VA. That lawyer can read the entire assessment. That lawyer believes that the entire assessment is admissible in any hearing at Immigration Court. That lawyer believes the entire assessment is relevant and probative. There is no discovery in Immigration Court.

207. Plaintiffs made a FOIA request for his Assessment more than 30 working days ago. The DHS has yet to disclose it. *See* Exhibit 4.

Plaintiffs have exhausted all administrative remedies.

*Ms. Alatanhua*

208. Ms. First Name Unknown [FNU] Alatanhua was born in China in 1980. She is a member of the Mongol ethnic group and is a Buddhist. She is against communism. Her government hates her because of her ethnic group, her religion, and her political opinion. She arrived in the United States in August 2015. She seeks asylum.

209. She was interviewed by the Newark Asylum Office in July 2019. The officer who interviewed her no longer works at that office. The Supervisory Asylum Officer who initialed the assessment no longer works at that office.

210. An Assessment was written about her case in July 2019.

211. That assessment is now in the file held by a DHS lawyer, who has an office in Hartford, CT. That lawyer can read the entire assessment. That lawyer believes that the entire assessment is admissible in any hearing at Immigration Court. That lawyer believes the entire assessment is relevant and probative. There is no discovery in Immigration Court.

212. Louise Trauma Center LLC and Ms. Alatanhua made a "third party" request for her entire assessment in March 2020. *See* Exhibit 5.

213. DHS, so far, has disclosed nothing in response.

214. Plaintiffs have exhausted all administrative remedies.

*Louise Trauma Center LLC*

215. Plaintiff Louise Trauma Center LLC is a nonprofit organization that helps asylum applicants. It is a domestic limited liability company, organized in the District of Columbia. It has made FOIA requests for Assessments of asylum applicants in the past, and will continue to do so in the future. It made third-party FOIA requests for each of the above plaintiffs.

*Department of Homeland Security*

216. Defendant United States Department of Homeland Security ("DHS") is an agency within the meaning of 5 U.S.C. § 552(e) and 701(b) (1), and is in possession and/or control of the records requested by Plaintiffs, and all similarly situated individuals, which are the subject of this action.

## FIRST CAUSE OF ACTION: MS EMUWA

217.. Plaintiffs repeat, allege, and incorporate the allegations contained in all paragraphs set forth above.

218. Ms. Emuwa asked Louise Trauma Center LLC to make a "third party" FOIA request for her assessment and other records. Louise Trauma Center made that request more than 30 working days ago. The DHS has still not furnished the records. *See* Exhibit 2, attached to this Complaint.

219. DHS has not yet made the records promptly available to plaintiffs, in violation of 5 U.S.C. § 552(a)(3(A).

220. Plaintiffs have the legal right under FOIA to obtain the Assessment and the other records, and no legal basis exists for defendant's failure to provide it.

221. DHS has violated the FOIA, 5 U.S.C. § 552 in the several ways as indicated above.

222. Plaintiffs have exhausted all administrative remedies.

## SECOND CAUSE OF ACTION: MR LUKUSA

223. Plaintiffs repeat, re-allege, and incorporate by reference all the allegations contained in all paragraphs set forth above as if fully set forth herein.

224. Mr Lukusa asked Louise Trauma Center LLC to make a "third party" FOIA request for his assessment, and for other records. Louise Trauma Center made that request more than 30 working days ago. The DHS has still not furnished the records. *See* Exhibit 3.

225. DHS has not yet made the records promptly available to plaintiffs, in violation of 5 U.S.C. § 552(a)(3(A).

226. Plaintiffs have the legal right under FOIA to obtain the Assessment and other records, and no legal basis exists for defendant's failure to provide it.

227. DHS has violated the FOIA, 5 U.S.C. § 552 in the several ways as indicated above.

228. Plaintiffs have exhausted all administrative remedies.

### THIRD CAUSE OF ACTION: MR ALQARAGHULI

229.. Plaintiffs repeat, re-allege, and incorporate by reference all the allegations contained in all paragraphs set forth above as if fully set forth herein.

230. Mr Alqaraghuli asked Louise Trauma Center LLC to make a "third party" FOIA request for his assessment and for other records. Louise Trauma Center made that request more than 30 working days ago. The DHS has still not furnished the records. *See* Exhibit 4.

240. DHS has not yet made the records promptly available to plaintiffs, in violation of 5 U.S.C. § 552(a)(3(A).

241. DHS did not determine within 30 working days whether to comply with the request and DHS did not notify plaintiffs of such determination and the reasons therefore, in violation of 5 U.S.C. § 552(a)(6)(A).

242. Plaintiffs have the legal right under FOIA to obtain the Assessment and the other records, and no legal basis exists for defendant's failure to provide it.

243. DHS has violated the FOIA, 5 U.S.C. § 552 in the several ways as indicated above.

244. Plaintiffs have exhausted all administrative remedies.

## FOURTH CAUSE OF ACTION: MS ALATANHUA

245. Plaintiffs repeat, allege, and incorporate the allegations contained in all paragraphs set forth above.

246. Ms.Alatanhua asked Louise Trauma Center LLC to make a "third party" FOIA request for her assessment and for other records. Louise Trauma Center made that request more than 30 working days ago. The DHS has still not furnished the records. *See* Exhibit 5.

247. DHS has not yet made the records promptly available to plaintiffs, in violation of 5 U.S.C. § 552(a)(3(A).

248. DHS did not determine within 30 working days whether to comply with the request and DHS did not notify plaintiffs of such determination and the reasons therefore, in violation of 5 U.S.C. § 552(a)(6)(A).

249. Plaintiffs have the legal right under FOIA to obtain the Assessment and the other records, and no legal basis exists for defendant's failure to provide it.

250. DHS has violated the FOIA, 5 U.S.C. § 552 in the several ways as indicated above.

251. Plaintiffs have exhausted all administrative remedies.

## FIFTH CAUSE OF ACTION: NEGLIGENT AND INADEQUATE TRAINING

252. Plaintiffs repeat, allege, and incorporate the allegations contained in all paragraphs set forth above.

253. DHS failed to adequately train its FOIA processors. *See* Exhibit 6.

254. DHS did not take reasonable measures to ensure that its processors were properly trained.

255. DHS negligently trained its processors.

256. As a result, plaintiffs have suffered harm.

257. Plaintiffs have exhausted all administrative remedies.

### SIXTH CAUSE OF ACTION: LOUISE TRAUMA CENTER LLC

258. Plaintiffs repeat, allege, and incorporate the allegations contained in all paragraphs set forth above.

259. Louise Trauma Center wants to ensure that asylum applicants obtain justice. It wants to monitor and examine the work of asylum offices, to ensure that the offices are doing their job properly, that their training and internal quality control mechanisms are sufficient. Louise Trauma wants to assist Congress and the advocacy community in the implementation and improvement of the asylum system; it wants to increase public awareness and to facilitate public oversight of the asylum system; and it wants to preserve the integrity of immigration court and asylum office proceedings.

260. Louise Trauma Center wants to monitor and examine the work of FOIA processors, to ensure that all requesters obtain justice, to ensure that the processors are doing their job properly, that their training and internal quality control mechanisms are sufficient. Louise Trauma wants to assist Congress and the advocacy community in the implementation and improvement of the FOIA system; it wants to increase public awareness and to facilitate public oversight of the FOIA system; and it wants to preserve the integrity of the FOIA system.

261. Louise Trauma Center is being forced to divert time and attention away from its goals to deal with the problems set forth in this Complaint. Its activities are being impeded. It is being forced to undertake expenditures in response to, and to counteract, the effects of the conduct of DHS.

262. A favorable decision from the Court would redress its injuries.

263. Louise Trauma Center has duties to its members and readers.

264. It will file FOIA requests in the future.

265. Louise Trauma Center is being injured by the above policies, practices, and acts of the defendant. Its ability to effectuate its above-stated goals is being adversely affected. It relies heavily and frequently on FOIA to conduct work that is essential to the performance of certain of its primary institutional activities. The acts of defendant hinder and prejudice this plaintiff in achieving its goals.

## CLASS ACTION ALLEGATIONS

266. Plaintiffs repeat, allege, and incorporate the allegations contained in all paragraphs set forth above.

267. This action is brought by the named plaintiffs on their own behalf and on behalf of the class of all other similarly situated individuals under the provisions of Fed. R. Civ. P. 23(a) and (b).

268. The class so represented by the above named Plaintiffs consists of all persons who, since June 30, 2016, have made, or will make during the pendency of this lawsuit, a FOIA request for the entire Assessment of their asylum office, but were rebuffed.

NUMEROSITY

268. The exact number of members of the class, as hereinabove identified and described, is not known, but it is reasonable to believe the class is so numerous that joinder of individual members is impracticable.  The class meets the requirements of Fed. R. Civ. P. 23(a)(1). More than 100 individuals are members of this class. Very few of the class members have English as their native language. The class members are dispersed throughout the United States.

269. When US-CIS adjudicates an affirmative asylum case, it transfers the case both to US Immigration and Customs Enforcement [ICE] (another component of DHS) and also to EOIR, a component of the Department of Justice.

270. ICE has a record system different from US-CIS.

*FY 2015* Fiscal year 2015:  October 1, 2014 – September 30, 2015

271. During this year:

 US-CIS received 84, 236 affirmative asylum cases; it approved 15, 999; and 20,353 were referred to ICE and to EOIR.
EOIR "completed" 40,000 cases
EOIR adjudicated 40, 062 affirmative asylum cases.
EOIR received 17, 270 affirmative asylum cases; granted 4, 768
= = = = = = = =

*FY 2016*

272. During this year:

US-CIS received 115, 888 affirmative asylum cases; approved 10, 762;  16, 564 referred to ICE and to EOIR
EOIR granted 11, 729 cases
EOIR "completed" 31, 400 affirmative asylum cases
EOIR received 12, 698 affirmative asylum cases; granted 3, 845
= = = = = = =

*FY 2017*

273. During this year:

US-CIS received 142, 760 affirmative asylum cases; granted 15, 229; referred 29, 639 to ICE and to EOIR
EOIR "completed" 50, 800
EOIR received 22, 081 affirmative asylum cases; granted 3, 603

274. During FY 2017, CIS received over 100,000 FOIA requests.

275. During FY17, CIS received over 190,000 FOIA requests.

276. During FY17, the vast majority of those requests were from individuals seeking all or some of their immigration records. These types of requests constitute over 95% of the requests received.

277. During FY17, more than 100,000 individuals requested "all" of their immigration records.

278. During FY17, the information processing system at US-CIS permitted electronic searches by a] the name of the individual; b] the alien number of the individual; and c] the topic of the records requested.

279. During FY17, more than 1,000 individuals requested their asylum office assessments.

= = = = = = =

*FY 2018* October 1, 2017-September 30, 2018

280. During this year:

US-CIS received 108, 031 affirmative asylum cases; approved 19, 978; referred 52,221 to ICE and to EOIR
EOIR "completed" 81, 900 affirmative asylum cases
25, 439 individuals were granted asylum [includes family members]
EOIR received 48, 822 affirmative asylum cases; granted 4,078

281. During FY18, the US-CIS received over 200,000 FOIA requests.

282. During FY18, the vast majority of those requests were from individuals seeking all or some of their immigration records. These types of requests constitute over 95% of the requests received.

283. During FY18, more than 100,000 individuals requested "all" of their immigration records.

284. During FY18, the information processing system at US-CIS permitted electronic searches by a] the name of the individual; b] the alien number of the individual; and c] the topic of the records requested.

285. During FY18, more than 1,000 individuals requested their asylum office assessments.

= = = = = = = = =

*FY 2019 [ends on September 30, 2019]*

286. During this year:

US-CIS received 82,807 affirmative asylum cases and "completed" 72, 287
US-CIS referred 61, 456 affirmative asylum cases to ICE and to EOIR
EOIR received 61, 456 affirmative asylum cases; granted 5,401

287. During FY19, the US-CIS received over 200,000 FOIA requests.

288. During FY19, the vast majority of those requests were from individuals seeking all or some of their immigration records. These types of requests constitute over 95% of the requests received.

289. During FY19, more than 100,000 individuals requested "all" of their immigration records.

290. During FY19, the information processing system at US-CIS permitted electronic searches by a] the name of the individual; b] the alien number of the individual; and c] the topic of the records requested.

291. During FY19, more than 1,000 individuals requested their asylum office assessments.

292. during FY 2019, US-CIS completed 72, 287 affirmative asylum cases.

293. As of the end of FY 2019, 340,810 affirmative asylum cases were waiting for interviews at US-CIS.

294. EOIR reported 476,000 pending asylum cases as of October 11, 2019.

= = = = =

*FY 2020* first and second quarters

295. During FY 2020, first and second quarters, US-CIS referred 25, 456 affirmative asylum cases to ICE and to EOIR, and EOIR received 25, 456 affirmative asylum cases; granted 3,326.

296. During FY20, first and second quarters, the US-CIS received over 200,000 FOIA requests.

297. During FY20, first and second quarters, the vast majority of those requests were from individuals seeking all or some of their immigration records. These types of requests constitute over 95% of the requests received.

298. During FY20, first and second quarters, more than 100,000 individuals requested "all" of their immigration records.

299. During FY20, first and second quarters, the information processing system at US-CIS permitted electronic searches by a] the name of the individual; b] the alien number of the individual; and c] the topic of the records requested.

300. During FY20, first and second quarters, more than 1,000 individuals requested their asylum office assessments.

301. For each asylum application adjudicated, an assessment is written.

302. For FY 17 and FY 18, over 35,000 assessments were written. *See* Exhibit 7.

303. For FY 17 and FY 18, another report shows that over 131, 000 assessments were written.

304. For FY 2018, over 38, 687 assessments were written.

305. For FY 2019, over 72,000 assessments were written.

306. EOIR reports that for FY 18, over 48,000 affirmative asylum applications were received. *See* Exhibit 8.  For each of these cases, there is an assessment.

307. EOIR reports that for FY 17 through the second quarter of FY 20, over 156,000 affirmative asylum applications were received. For each of these cases, there is an assessment.

MANY OTHER REQUESTS ARE STILL UNANSWERED

308. The following requests are still unanswered:

-COW 2020 000 669 [sent to DHS on May 19, 2020] [Your information processing system]

2020-IFCO-51004 [sent to ICE in May 2020]

ICE  2020-ICFO-35169 [sent to ICE in May 2020]

-FOIA 2020-32155 [sent to EOIR on May 16, 2020]

Louise Trauma made an email FOIA request to ICE on May 17, 2020, requesting "records about affirmative asylum applicants referred from ICE to EOIR during FY 2017" and a follow-up email on June 4, 2020, but ICE has not responded in any way

= = = = = = = =

COMMONALITY

309. The relief sought is common to the entire class, and there are common questions of law and fact that relate to and affect the rights of each member of the class.  These common questions include whether the agency's continued policy and/or pattern and practice of not

releasing entire Assessments is unlawful. The class meets the requirements of Fed. R. Civ. P. 23(a)(2).

310. The claims of the named plaintiffs are typical of the claims of the proposed class: the plaintiffs have not been provided with their entire Assessments. The class meets the requirements of Fed. R. Civ. P. 23(a)(3).

310. The representative parties will fairly and adequately protect the interests of the class. All requirements of Fed. R. Civ. P. 23 (a)(4) have been met. The named plaintiffs seek the same relief as is sought by the class members. The named plaintiffs have no interests adverse to other class members. Counsel for plaintiff has the skills and experience necessary to litigate this case.

311. Defendant has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. Defendant has a policy and practice of not providing entire assessments to FOIA requesters. All requirements of Fed. R. Civ. P. 23(b)(2) have been met.

322. Questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. All requirements of Fed. R. Civ. P. 23(b)(3) have been met.

323. Each of the above-named plaintiffs has exhausted any and all administrative remedies with defendant.

## PRAYER FOR RELIEF

324. WHEREFORE, plaintiffs pray that this Court certify this matter as a class action, appoint the named plaintiffs as class representatives, and appoint undersigned counsel as class counsel;

And also: plaintiffs, and each of them, pray that judgment be entered in his or her favor against defendant and that the court:

a) Order defendant to disclose the entire Assessment to each plaintiff forthwith;

b) Declare that defendant's failure to provide that document violates FOIA;

c) Declare that the policy and practice of defendant of refusing to disclose that document violates FOIA;

e) Order defendant to discontinue all of the above unlawful policies and practices;

g) Enjoin defendant from failing to disclose that document in the future;

h) Order defendant to revamp and improve its training of officers;

i) Award plaintiffs reasonable attorney fees and costs pursuant to 5 U.S. C. §552(a) (4) (E)

j) Grant all other such relief to plaintiffs as the Court deems proper and equitable.

Respectfully submitted,

Attorney for Plaintiffs

/s/ *David L. Cleveland*
David L. Cleveland
DC Bar # 424209
1220 L Street NW #100
Washington, DC 20005
[202] 812-8684    <1949.david@gmail.com>