UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| | ) | |
| AMARA EMUWA, ET AL, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 20-1756 (TNM) |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| HOMELAND SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPPOSITION
TO DHS MOTION FOR SUMMARY JUDGMENT**


Dated: 0ctober 28, 2020

Washington, DC

Respectfully Submitted,

Attorney for Plaintiffs

/s/ *David L. Cleveland*
David L. Cleveland
DC Bar # 424209
1220 L Street NW #100
Washington, DC 20005
[202] 812-8684    1949.david@gmail.com

**TABLE OF CONTENTS**

INTRODUCTION…………………………………………………………………...…..5

ARGUMENT
I.      DHS PERFORMED A REASONABLE SEARCH………………………………8

II.     DHS DID NOT PROPERLY APPLY EXEMPTIONS TO RECORDS…………8
        A. Exemption 3 withholdings………………………………………………………11
        B. Exemption 5 withholdings………………………………………………………11
            i.      Attorney Work-Product Privilege…………………………………...11
            ii.     Deliberative Process Privilege………………………………………...11

III.    DHS HAS NOT RELEASED ALL REASONABLY
        SEGREGABLE INFORMATION…………………………………………………...23

IV.     LOUISE TRAUMA CENTER'S POLICY-OR-PRACTICE CLAIMS
        ARE WELL-FOUNDED…………………………………………………………..27
..
V.      DHS PROVIDED INADEQUATE TRAINING TO ITS FOIA PROCESSORS....28

VI.     MS. EMUWA'S CLAIM, SET FORTH IN THE FIRST CAUSE
        OF ACTION IN THE COMPLAINT, IS WELL-FOUNDED……………………………29

VII.    MR. LUKUSA'S CLAIM, SET FORTH IN THE SECOND CAUSE
        OF ACTION IN THE COMPLAINT, IS WELL-FOUNDED……………………………..32

VIII.   MR. ALQARAGHULI'S CLAIM, SET FORTH IN THE THIRD
        CAUSE OF ACTION IN THE COMPLAINT, IS WELL-FOUNDED…………………33

IX.     MS. ALATANHUA'S CLAIM, SET FORTH IN THE FOURTH
        CAUSE OF ACTION IN THE COMPLAINT, IS WELL-FOUNDED…………………34

X.      THE FIFTH CAUSE OF ACTION IN THE COMPLAINT,
        "NEGLIGENT AND INADEQUATE TRAINING," IS WELL-FOUNDED……..………35

XI.     THE SIXTH CAUSE OF ACTION IN THE COMPLAINT, HARM
        TO LOUISE TRAUMA CENTER, IS WELL-FOUNDED………………………...……35

CONCLUSION………………………………………………………………………...…36.

# TABLE OF AUTHORITIES

**Cases**

Cases marked with * are chiefly relied upon

*Abtew v. DHS,* 808 F.3d 895, 899 (D.C. Cir. 2015) ……………………………………12

*Amadis v. Dep't of State,* 971 F.3d 364, 371 (D.C.Cir. 2020)…………………………..18

*American Wild Horse Preservation Campaign v. Perdue,*
873 F.3d 914, 923 (D.C.Cir. 2017) ……………………………………………………..19

*Brennan Center v. DOJ* 2020 WL 1451503, *7 (D.D.C. March 25, 2020)…………..17

*Center for Investigative Reporting v. US. Dep't of Interior,*
2020 WL 1695175, *3 (D.D.C. April 7, 2020) …………………………………………11,28

*Center for Investigative Reporting  v. U.S. Customs and Border Protection,*
436 F. Supp. 3d 90, (DD.C. 2019)……………………………………………………… 9

*Citizens to Preserve Overton Park v. Volpe,* 91 S. Ct. 814, 825 (1971)…………………19

*Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d 854, 868 (D.C. Cir. 1980). . ..12,17

*Cojocari v. Sessions,* 863 F.3d 616, 622 (7th Cir. 2017)…………………………………..6

*DHS v. Regents of Univ. of California,* 140 S. Ct. 1891, 1908 (2020)…………………19.

*EPIC v. US DHS,* 777 F.3d 518 (D.C. Cir. 2015)……………………………………………..8

*Evans v. Fed. Bureau of Prisons,* 951 F. 3d 578, 584 (D.C. Cir. 2020)………………..7,13

*Exxon Corp v. Fed. Trade Comm,* 663 F.2d 120, 126-27 (D.C. Cir. 1980)…………….13

*Founding Church of Scientology v. Nat'l Sec. Agency,*
610 F.2d 824, 831 (D.C. Cir. 1979)……………………………………………………..14

*Grace v. Barr,* 965 F.3d 883, 887 (D.C. Cir. 2020)…………………………………..5,19

*Inst. For Justice v. IRS,* 941 F.3d 567, 574 (D.C. Cir. 2019). ………………………….17

*Judicial Watch v. FDA,* 449 F.3d 141, 146 (D.C. Cir. 2006)……………………………9

Ju*dicial Watch v. U.S. Dep't of Justice,*
2020 WL 5798442 (D.D.C. September 29, 2020),…………………………………….28

*Kapende v. Dep't of Homeland Security,* 2020 WL 2610873 (D.C. Cir. 4-17-20)………18

*Khatchadourian v. Defense Intelligence Agency,*
453 F. Supp. 3d 54, 124 (D.D.C. 2020)……………………………………………..17

*\*Kisor v. Wilkie* 139 S. Ct. 2400, 2417 (2019)………………………………………14

*Matter of Krynicki,* 983 F.2d 74, 75 (7th Cir. 1992)…………………………………16

*Kudryashov v. Holder,*492 Fed. Appx.734, (9th Cir. 2012)………………………………6

*Metlife, Inc. v. Financial Stability Oversight Council,*
865 F.3d 661, 675 (D.C. Cir. 2017)……………………………………………………16

*Moore v. Aspin,* 916 F. Supp. 32, 35 (D.D.C. 1996) ………………………………………8

*Nat'l Archives v. Favish,* 541 U.S. 157, 171–72 (2004) …………………………………8

*Matter of O-F-A-S-,* 27 I&N Dec. 709, 721 (BIA 2019)……………………………..…..5

*Oglesby v. Dep't of Army,* 920 F.2d 57 (D.C. 1990)…………………………………………34

*Padilla v. Kentucky,* 559 U.S. 356, 371, n. 11 (2010)……………………………………….5

*Perry v. Shinseki,* 783 F. Supp. 2d 125, 131 (D.D.C. 2011)………………………………..26

*Price v. United States DOJ,* 865 F.3d 676, 682 (D.C. Cir. 2017) ………………………8

*In re R-S-J-,* 22 I&N Dec. 863, 872 (BIA 1990)……………………………….............. 6

*Sacko v. Holder,* 510 Fed. Appx.409, (6th Cir. 2013). ……………………………..…6

*Senate of Puerto ex rel. Judiciary Comm. v. US DOJ,* 823 F.3d 574, 585 (D.C. Cir. 1987) …15
*\*Shapiro v.US Dep't of Justice,*
 2020 WL 3103 946 (D.D.C. June 11, 202020)……………………………………………..9
*Sinani v. Holder,* 418 Fed. Appx. 475, (6th Cir. 2011)…………………………………………6
*Singh v. Gonzales,* 403 F.3d 1081, 1087 (9th Cir. 2005)…………………………………………21
*\*Stone v. INS,* 514 U.S. 386 (1995)……………………………………………………10,24
*U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 150 (1989)………………………..…..8
*U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991)……………………………………….8.
*Washington Post v. US DOJ,* 863 F.2d 96, 101 (D.C.Cir. 2001)……………………………....13

## Regulations

8 C.F.R. section 208.24 (c). ………………………………………………………………21
8 C.F.R. § 208.12(a)………………………………………………………………....25,26
8 C.F.R. section 208.12 (b) …………………………………………………………….....25

## Legislative materials

Senate Report 114-4 …………………………………………………………………9,10
S.Rep.No. 813 (1965)………………………………………………………………....12
House Report 114-391 …………………………………………………………………9,10

## Attachments

A  Declaration of David Cleveland:
   History; copies of entire Assessments……..13,17,21,22
B  NOID…………………………………………21
C  NOID same as Assessment;
   Who has access to Assessments?.…………22
D  Affirmative Asylum Procedures Manual… 21,22,23
E  Interrogatories…………………………….....13, 21
BB [Eggleston declaration of 2015]…………..5,18,31
CC [Eggleston declaration of 2018]…………..5,18,31

## INTRODUCTION

Four individuals and a non-profit organization filed a Complaint, seeking the entire assessment of the asylum office. DHS will not suffer any harm if assessments are disclosed.

The DHS has been very inconsistent about assessments. From 1998-2005, DHS routinely released them in full. Then, without explanation, DHS stopped. In 2015, the agency representative, Ms. Eggleston, told a court the assessments must be entirely withheld because of the need to protect how asylum officers "prioritized, then analyzed information." *See* Attachment BB. After being criticized by a few courts, Ms. Eggleston told a court in 2018 that assessments must be withheld to prevent applicants from "tailoring" their applications, and so that the agency would not be "hindered." *See* Attachment CC. After the D.C. Circuit vacated the district court decision that had relied upon that theory, Ms. Eggleston now, in 2020, says assessments must be withheld so that employees are not "chilled or deterred," and also to prevent fraud. *See* ECF #14-2.

The agency has never explained why it keeps changing its position. This Court should conclude that Ms. Eggleston only offers a "litigation" declaration. The Court should deem it insufficient.

ASYLUM

As the Court considers the harm that DHS claims it will suffer, it should bear in mind the burdens that asylum applicants face.

First, to win asylum, the applicant must have suffered "severe mistreatment." *Matter of O-F-A-S-,* 27 I&N Dec. 709, 721 (BIA 2019) (being beaten and held in prison for five days is not enough).If he loses, he could be deported and "might well be killed" in his home country. *Padilla v. Kentucky,* 559 U.S. 356, 371, n. 11 (2010). "The stakes are high." *Grace v. Barr,* 965

F.3d 883, 887 (D.C. Cir. 2020) (applicants are to be interviewed by "trained asylum officers."). The D.C. Circuit has solicitude for asylum applicants, as indicated by its criticism of the government for arbitrarily changing its policies. "USCIS's failure to acknowledge the change in policy is especially egregious given its potential consequences for asylum seekers." *Id.* at 901. That Court also lamented that the government recently "severely circumscribed newly-arrived aliens' ability to seek asylum." *Id.* at 908. Are asylum officers correctly applying the law? Release of their entire assessments will allow the public to evaluate their work.

Second, entire assessments are used in Immigration Court to show the applicant lacks credibility, and hence does not deserve asylum. court. *In re R-S-J-*, 22 I&N Dec. 863, 872 (BIA 1990)("It may be necessary to present the testimony of the asylum officer before the Immigration Court, together with notes and other evidence of what was said under oath.")

Assessments have often been relied upon by appellate courts: *Sinani v. Holder,* 418 Fed. Appx. 475, (6th Cir. 2011). *Kudryashov v. Holder,*492 Fed. Appx.734, (9th Cir. 2012). *Sacko v. Holder,* 510 Fed. Appx.409, (6th Cir. 2013). There is no discovery in immigration court; therefore, applicants can be surprised and ambushed there by assessments.

Third, even minor inconsistencies can be used to deny asylum. If in-court testimony differs from details in the assessment, asylum can be denied. Immigration Judges at times seize upon tiny inconsistencies to deny asylum. For example, in *Cojocari v. Sessions,* 863 F.3d 616, 622 (7th Cir. 2017), the Immigration Judge denied asylum, in part because of these inconsistencies between in-court testimony and statements at the asylum office: being released from a hospital on July 2d instead of July 7th; being released from a hospital on November 6th instead of November 5th;  staying with in-laws for "two to three months" instead of "about a month and a half."

Entire assessments are used in court to thwart asylum applicants, and to cause them real harm. The harm that DHS claims it will suffer is trivial by comparison.

PROCEDURAL BACKGROUND

Four individual plaintiffs and a non-profit organization filed a Complaint, ECF No. 1, seeking their entire assessments and also class-wide relief. The Complaint has six causes of action. The DHS motion for summary judgment does not discuss each cause of action individually; instead, it lumps them together and offers conclusory statements in its support.

STANDARD FOR SUMMARY JUDGMENT

The record should be viewed "in the light most favorable to the nonmovant." *Evans v. Fed. Bureau of Prisons,* 951 F. 3d 578, 584 (D.C. Cir. 2020). Where agency affidavits are "conclusory, merely reciting statutory standards, or if they are too vague or sweeping…or lacks specificity…" summary judgment will be denied. *Id.* at 586. [cleaned up]. [in *Evans,* summary judgment was denied, in a FOIA case where an inmate was stabbed inside a prison. The agency declaration said that "disclosure may invade privacy of others." But the declaration did not state if the inmates could see the camera, or if there were blind spots. The Court suggested that a trial might be necessary.]

*Evans* stands for the principal that an agency employee having knowledge of internal FOIA processing and searches may lack knowledge about another important aspect of the case, and that, therefore, summary judgment should be denied. In the instant case, DHS has submitted the declaration of Ms. Jill Eggleston, ECF No. 14-2, who has knowledge of FOIA procedures in her office in Kansas. She does not claim to have personal knowledge of what asylum offices in Chicago or Arlington VA do.

**ARGUMENT**

**I.    DHS PERFORMED A REASONABLE SEARCH**

Plaintiffs do not contest this.

**II.    DHS DID NOT PROPERLY APPLY EXEMPTIONS TO RECORDS**

*Introduction to the FOIA*

The Supreme Court has described FOIA as "a means for citizens to know what their Government is up to" and "a structural necessity in a real democracy." *Nat'l Archives v. Favish,* 541 U.S. 157, 171–72 (2004) (cleaned up). There are exemptions, but they must be "narrowly construed." *EPIC v. US DHS,* 777 F.3d 518, 522 and at 524, first sentence and again at last sentence (D.C. Cir. 2015). All "underlying facts and the inferences to be drawn from them are construed in the light most favorable to the FOIA requester." *Moore v. Aspin,* 916 F. Supp. 32, 35 (D.D.C. 1996) (citations omitted).

The intent behind the FOIA was to "clos[e] the loopholes which allow agencies to deny legitimate information to the public." *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 150 (1989) (citations and quotations omitted).  Accordingly, FOIA mandates a "strong presumption in favor of disclosure," with "disclosure, not secrecy, [being its] . . . dominant objective. " *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991). In some cases, FOIA "is the only vehicle" for keeping prosecutors honest. *Price v. United States DOJ,* 865 F.3d 676, 682 (D.C. Cir. 2017) (FOIA results led to the release of a man sentenced to 19.5 years' imprisonment, the vacating the conviction of a man sentenced to sixty years' imprisonment and to the exoneration of two men who had spent decades on death row).  An editorial in the *New York Times,* May 12, 2020 said:

> Ignoring Freedom of Information Act cases during the crisis damages democracy…FOIA requests have yielded insights into the long-running war in Afghanistan, fraud in the Medicare system and Google's potentially monopolistic practices. And they have served

the public in more mundane matters, like the placement of red-light cameras or the proceedings of the local permitting board.

The D.C. Circuit has noted that a FOIA plaintiff "faces an 'asymmetrical distribution of knowledge' where the agency alone possesses, reviews, discloses, and withholds the subject matter of the request." *Shapiro v.US Dep't of Justice,* 2020 WL 3103 946 (D.D.C. June 11, 2020)(citing *Judicial Watch v. FDA,* 449 F.3d 141, 146 (D.C.Cir. 2006).

> "The D.C. Circuit has settled on requiring the agency to submit the following information: The agency must describe each document or portion thereof withheld…. It must specifically identify the reasons why a particular exemption is relevant. It must correlate those claimed exemptions with the particular part of a withheld document to which they apply…And for each withholding it must discuss the consequences of disclosing the sought-after information."

> *Shapiro,* 2020 WL 3103946 at *1. [cleaned up]

*Congress was concerned that agencies were overusing FOIA exemptions*

Senate Report 114-4 and House Report 114-391 both show the "concern that agencies are overusing these exemptions to protect records that should be releasable under the law." *Center for Investigative Reporting v. U.S. Customs and Border Protection,* 436 F. Supp. 3d 90, 104 (D.D.C. 2019) There was a "growing and troubling trend of invoking FOIA exemptions *even though* no harm would result from disclosure." *Id.* at 104 [emphasis added]

> "Congress was especially concerned about agencies' reliance on Exemption 5 and the deliberative process privilege. The Senate Report, for instance, noted that agencies had invoked Exemption 5 "more than 79,000 times in 2012—a 41% increase from the previous year." The House Report, similarly, pointed to "[e]xemption five ... as a particularly problematic exemption," and explained further that "[t]he deliberative process privilege is the most used privilege and the source of the most concern regarding overuse." H.R. REP. NO. 114-391, at 10

> *Id.* at 104-05.

Congress desired that "the content of a particular record [w]ould be reviewed and a determination made as to whether the agency reasonably foresees that disclosing that particular document, given its age, content, and character, would harm an interested protected by the applicable exemption." S. REP. NO. 114-4, at 8. *Id.* at 105.

So, Congress amended the FOIA by adding a sub-section:  5 U.S. C. § 552 (a)(8)(A) provides that, even if a record is otherwise exempt, the agency shall withhold "only if" the agency "reasonably foresees that disclosure would harm to an interest protected by an exemption…"

This imposes "an independent and meaningful burden on agencies." *NRDC v. EPA*, No. 17-CV-5928 (JMF), 2019 WL 3338266, at *1 (S.D.N.Y. July 25, 2019); *see also, e.g.*, *Judicial Watch I*, 375 F. Supp. 3d at 100 (describing the new foreseeable-harm requirement as a "heightened standard"). Indeed, as the foregoing legislative history illustrates, the text, history, and purpose of the FOIA Improvement Act confirm that the foreseeable-harm requirement was intended to restrict agencies' discretion in withholding documents under FOIA.

This sub-section must be given effect. *See Stone v. INS*, 514 U.S. 386, 397, 115 S.Ct. 1537, 131 L.Ed.2d 465 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect.").

To meet this new burden, the agency must "identify specific harms to the relevant protected interests that it can reasonably foresee would actually ensue from disclosure of the withheld materials" and "connect[ ] the harms in [a] meaningful way to the information withheld." *Judicial Watch II*, 2019 WL 4644029, at *5; *see* H.R. REP. NO. 114-391, at 9 ("An inquiry into whether an agency has reasonably foreseen a specific, identifiable harm that would be caused by a disclosure would require the ability to articulate both the nature of the harm and

the link between the specified harm and specific information contained in the material withheld.").

In *Center for Investigative Reporting v. US. Dep't of Interior,* 2020 WL 1695 175, *3 (D.D.C. April 7, 2020) the Court said this new sub-section creates "a heightened standard." To satisfy its obligations, the agency must "articulate both the nature of the harm and the link between the specified harm and specific information contained in the material withheld." *Id.* [citations omitted).

The agency must do more than suggest that harm might occur; the agency must explain how disclosing "this *particular* record" would cause an identifiable harm. [emphasis in original] *Id.* at *4. (citations omitted)(the Officer of the Solicitor said that three pages of notes could cause several harms, including impacting on the freedom to candidly discuss internal legal strategy; Court held this was too vague).

A. **Exemption 3 withholdings**

Plaintiffs want four entire assessments to be released. Exemption 3 withholdings do not apply to assessments.

B. **Exemption 5 withholdings**

i.    *Attorney-Work Product Privilege*

DHS mentions, at page 29 of 41 of its Motion, ECF No. 14, in italics, the "attorney-work product" privilege. But the next sentence discusses the "attorney-client" privilege. The next sentence goes back to "work-product." Neither privilege applies. DHS does not identify who the attorney is, nor who the client is. DHS refers to "ongoing or potential" litigation. DHS does not know which? DHS does not identity any litigation.

ii.    *Deliberative Process Privilege*

The deliberative process privilege has been given a "narrow scope." *Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d 854, 868 (D.C. Cir. 1980). "We reemphasize the narrow scope of Exemption 5 and the strong policy of the FOIA that the public is entitled to know what its government is doing and why. The exemption is to be applied 'as narrowly as consistent with efficient Government operation.' S.Rep.No. 813, 89th Cong., 1st Sess. 9 (1965)." *Id.*

In *Coastal States,* the Department of Energy argued that memoranda interpreting regulations as applied to facts, were exempt under the deliberative process privilege. In rejecting that argument, the Court noted the following: the documents were not "candid or personal in nature;" there was no "concern for appearances and for [the] interests [of the authors];nor was there "weighing the pros and cons of agency adoption of one viewpoint or another." 617 F.2d at 866. Further, there was "nothing subjective or personal about the memoranda; they are simply straightforward explanations of agency regulations in specific factual explanations." *Id.* at 868.

> The documents do not contain subjective, personal thoughts on a subject, so public knowledge of the documents will not subject the writer either to ridicule or criticism…. DOE asserts that its attorneys will be less "candid" in the future if these memoranda are disclosed, but we are unable to find in any of the fourteen documents any statement which could be described as "candid." We can see no possibility whatsoever that an attorney performing this job would be less "frank" or "honest" if he or she knew that the document might be made known to the public; there is little to be frank or honest about when explaining on what date a transaction occurs under 10 C.F.R. section 212.31.

*Id.* at 869.

These Department of Energy memoranda have a great deal in common with asylum office assessments: neither are "personal;" neither contain "candid" comments.

### The asylum office assessment is the final decision of the agency

In *Abtew v. DHS,* 808 F.3d 895, 899 (D.C. Cir. 2015) the Court ruled that an assessment was protected by the deliberative process privilege, because it was not the final decision of the agency. However, as stated in footnote 1, "…we do not rule out the possibility that initialing a

memo together with other circumstances might indicate agency adoption of that memo in some cases. But Abtew has not presented evidence to support that conclusion here."

Plaintiffs in this case now present that evidence of "other circumstances:" *see* Declaration of David Cleveland dated October 13, 2020 [attached hereto as Attachment A].  Mr. Cleveland talked to two asylum officers who told him that the assessment is indeed the final decision of the agency. *Id.* at ¶ 4. To be sure, this is hearsay. Plaintiffs seek discovery to establish the truth of this matter. If Mr. Cleveland is mistaken, or if procedures are now different in the asylum office, DHS could easily and quickly set forth the facts, via a declaration from an asylum officer with personal knowledge. Ms. Eggleston does not claim to have any personal knowledge of this matter. Her conclusions should not be accepted on this record.

*Plaintiffs seek discovery on this issue*

Plaintiffs seek discovery on this issue. *See* Attachment E, Interrogatory #5, which asks if there is a DHS employee who has personal knowledge of what happens inside an asylum office, and which asks if Jill Eggleston has any personal knowledge. DHS could answer this in 60 seconds.

*The Eggleston Declaration is conclusory and unsupported by factual data*

ECF No. 14-2 is a Declaration from Ms. Jill Eggleston. She says at ¶ 1 that she bases her statements on her own knowledge, and what others have told her. She does not explain or distinguish her statements: which are based on personal knowledge, and which are not? "Conclusory allegations unsupported by factual data will not create a triable issue." *Exxon Corp v. Fed. Trade Comm,* 663 F.2d 120, 126-27 (D.C. Cir. 1980). The agency has "the burden" to demonstrate that a document is exempt, and this burden "cannot be met by mere conclusory statements." *Washington Post v. US DOJ,* 863 F.2d 96, 101 (D.C.Cir. 2001). In *Evans v. Prisons,*

455 F.3d 123 (D.C.Cir. 2020), the Court rejected conclusions offered by an agency employee who did not have personal knowledge of what a prison video camera would record. In that case, what was or was not recorded was important. In this case, what asylum officers know and do is important. Ms. Eggleston does not claim to have ever in her life talked to an asylum officer, or anyone who worked in an asylum office.

To be sure, at times, an agency declaration is accorded a presumption of good faith. But a Court's review of an agency statement is not to be vacuous; it is not to be a rubber stamp. A Court should ensure that the agency is not just offering a convenient litigation statement.

Courts in this Circuit do not rubber stamp each and every statement put forth by government agencies. Indeed, the D.C. Circuit found an affidavit claiming that disclosure would "jeopardize [the agency's] national security functions" to be too conclusory because it did not adequately describe the damage to national security. *Founding Church of Scientology v. Nat'l Sec. Agency,* 610 F.2d 824, 831 (D.C. Cir. 1979).

An agency official may have some special knowledge, or she may not. If not, there is no need to defer to her. "That means, we have stated, that a court should decline to defer to a merely convenient litigating position, or *post hoc* rationalizations advanced to defend past agency action against attack." *Kisor v. Wilkie,* 139 S. Ct. 2400, 2417 (2019) (cleaned up).

Rule 602 of the Federal Rules of Evidence, *Need for Personal Knowledge,* provides: "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." The Advisory Committee on Rules commented that the rule requiring the witness to have had "an opportunity to observe," and "must have actually observed the fact" comes from the common law.

The agency official should set forth facts, if she knows any. Setting forth only a conclusion is insufficient. "Where no factual support is provided for an essential element of the claimed privilege or shield, the label 'conclusory' is surely apt." *Senate of Puerto ex rel. Judiciary Comm. v. US DOJ,* 823 F.3d 574, 585 (D.C. Cir. 1987)

*There is no evidence that DHS conducted a "foreseeable harm" analysis.*

At page 33 of 41 of ECF No. 14, DHS claims that a "foreseeable harm" analysis was performed, citing to ¶s 38-40 of the Eggleston Declaration. But those paragraphs just repeat what DHS said in its brief: that an analysis was conducted. ¶ 38 says release "could cause a foreseeable harm." But what is the harm? How would release of something, undescribed, harm something else, also not described? ¶ 38 is vague and states no facts.

*The first sentence of ¶ 39*

The first sentence of ¶ 39 of the Eggleston Declaration refers to "the asylum officer" and states that release of undescribed information would "chill or deter USCIS employees from engaging in [full discussions]." Why would that be the case? The first sentence mentions "asylum officer," but then mentions "employees." Who are the employees? How are these "employees" affected? The use of the word "employees" suggests that someone other than asylum officers are in mind.

There is no evidence of anyone having discussions with anyone. There is no evidence that "discussions" are in the assessment. If discussions are not in assessments, then how is anyone chilled or deterred?

*The second sentence of ¶ 39 has four elements*

The second sentence of ¶ 39 states that revealing the analysis of "asylum and supervisory asylum officers" could provide a bad actor with "information" that would allow him to "tailor" his application in a "fraudulent" manner.

a. This sentence suggests that the analysis of *two* persons are in the assessment: the asylum officer and also his supervisor. Is that true? There is no evidence of this. The first sentence of ¶ 39 refers the "asylum officer," but does not mention the supervisor. The second sentence mentions both.

b. "Information" would be released. Such as what? One type of information interesting and useful to asylum applicants are the sources used by the officer. If the officer cites, or never cites, the *New York Times,* or the *BBC,* for example, the applicant gets good information. There is no reason to hide this information.

Ms. Eggleston does not explain what "information" in an assessment would help fraud. Ms. Emuwa is a Christian from Nigeria who suffered domestic violence. Mr. Alqaraghuli is a Sunni-Shia from Iraq who has pro-Western political opinions. How would information from one assessment help someone else do fraud?

District court opinions contain "information." A Judge might deny damages to an employee who missed the statute of limitations or who did not show evidence of future lost wages. This is "information." But society has decreed that it is in the public interest that opinions be published. *Metlife, Inc. v. Financial Stability Oversight Council,* 865 F.3d 661, 675 (D.C. Cir. 2017) instructs that "a fundamental norm of our judicial system [is that] judges' decisions and their rationales must be available to the public. *See Matter of Krynicki*, 983 F.2d 74, 75 (7th Cir.

1992) ('Judges deliberate in private but issue public decisions after public arguments based on public records.')".

c.    "Tailoring" is a good thing. To tailor is to cut precisely and to cut off unnecessary things. Judges appreciate it when litigants tailor their briefs to what is important. The Defense Intelligence Agency was criticized because it did "not provide a 'precisely tailored' description of the decision-making process." *Khatchadourian v. Defense Intelligence Agency,* 453 F. Supp. 3d 54, 124 (D.D.C. 2020) (quoting from *Coastal States Gas Corp.* 617 F.2d at 868). The IRS was criticized because it "failed to tailor" its withholdings to only that which the exemption protects. *Inst. For Justice v. IRS,* 941 F.3d 567, 574 (D.C. Cir. 2019). The Department of Justice was criticized "because it did not tailor the search terms to plaintiff's specific request", in *Brennan Center v. DOJ* 2020 WL 1451503, *7 (D.D.C. March 25, 2020)

d. "Fraud" is bad; but how does releasing information promote it? Ms. Eggleston does not explain. Also, fraud is not an "interest" protected by the deliberative process privilege.

*DHS disclosed entire assessments from 1998-2005*

As stated in ¶ 2 of the Declaration of David Cleveland dated October 13, 2020, the DHS routinely released entire assessments to FOIA requesters from 1998-2005. *See* Attachment A. Five of them are attached to the declaration. The fact that assessments were routinely disclosed is evidence that doing so caused to harm to anyone. The DHS has not yet explained why it changed its policy. A Court need not grant deference to an agency that changes its policy without explanation.

*Ms. Eggleston offered different rationales in earlier cases*

Ms. Eggleston offers two theories why assessments should not be fully disclosed: 1] it

would "chill or deter" and 2] it would assist in fraud. These are new theories, not mentioned in earlier litigations.

*Declaration of July 28, 2015, submitted in Gatore v. DHS*

In *Gatore v. DHS,* ECF No. 23-1 is a declaration of Ms. Eggleston dated July 28, 2015, attached hereto as Attachment BB.  At ¶ 19, it reads: "It is in the interest of USCIS to protect the manner in which asylum officers, such as those that interviewed the plaintiffs, prioritize then analyze information…"

*Declaration of September 20, 2018, submitted in Kapende v. DHS*

In *Kapende v. DHS,* ECF NO. 13-1 is a declaration dated September 20, 2018, attached hereto as Attachment CC.   at ¶ 10, it reads

> Public disclosure of the withheld information will lead to asylum applicants tailoring their applications and interview responses to what they believe will tip an asylum officer's decision in their favor. Public disclosure of the asylum officer's deliberative process will hinder the Agency's ability to make determinations solely on the merits of an asylum claim.

This district court in *Kapende* was persuaded by these reasons. However, after Kapende filed an appeal and also a brief at the D.C. Circuit, the DHS released the entire assessments. The D.C. Circuit then vacated the decision of the district court. *Kapende v. DHS,* 2020 WL 2610 873 (D.C. Circuit April 17, 2020).

Absent from these earlier declarations is any mention of "chill or deter" or of fraud.

Ms. Eggleston does not explain why she offers different theories at different times.

To be sure, *Amadis v. Dep't of State,* 971 F.3d 364, 371 (D.C.Cir. 2020) offers language in support of DHS in this case. In *Amadis,* the agency adequately and fully explained the contents of the documents, and did not have a history of earlier inconsistencies. Here, Ms. Eggleston's declarations are confusing and inconsistent.

A Court should not give credence to "impermissible post hoc rationalizations." *DHS v. Regents of Univ. of California,* 140 S. Ct. 1891, 1908 (2020). In that case, DHS Secretary Duke gave one reason for a policy in 2017; nine months later DHS Secretary Neilsen gave different reasons. This struck the Court as a mere "convenient litigating position." *Id.* at 1909.  The Court did not approve of 'litigation affidavits.'" *Id.* at 1909. (quoting from *Citizens to Preserve Overton Park v. Volpe,* 91 S. Ct. 814, 825 (1971) (rejecting 'litigation affidavits' from agency officials as 'merely *post hoc* rationalizations.")

DHS acted arbitrarily and capriciously because it changed its position without acknowledging and explaining the change.

An agency may not "depart from a prior policy *sub silentio." American Wild Horse Preservation Campaign v. Perdue,* 873 F.3d 914, 923 (D.C.Cir. 2017). An agency changing its course must explain that prior policies "are being deliberately changed, not casually ignored." *Id.* [cleaned up].  In *Grace v. Barr,* 965 F.3d 883, 900 (D.C. Cir. 2020), one issue was how to deal with this situation: if a woman in El Salvador is beaten and raped by her ex-husband, and her government does very little to protect her, when does she win asylum in the United States? The U.S. government set forth one standard, and used it for years. Then, without explanation, the U.S. government announced a new standard. When the new standard was challenged in court, the government "nowhere" argued that it had "provided a reasoned explanation for the change…Accordingly, we have no choice but to find the standard arbitrary and capricious." *Id.* at 900. [cleaned up]

DHS has frequently changed its policies, without explanation: from 1998-2005, it freely disclosed entire assessments; but then it stopped; in 2015, Ms. Eggleston said assessments are privileged because of the "need to protect the process of how officers analyze and prioritize;" in

2018, Ms. Eggleston said assessments are privileged because we want to prevent "tailoring and

hindering;" in 2020, Ms. Eggleston said they are privileged because otherwise employees would

be "chilled or deterred" and there would be "fraud."

> *Most of various harms suggested by Ms. Eggleston are not in the training material given*
> *to FOIA processors.*

ECF No. 1-6 summarizes 1,321 pages released by DHS concerning the training it

gives to its FOIA processors.  They are instructed to consider "the chilling effect" of disclosure.

They are not instructed concerning other theories mentioned by Ms. Eggleston: protect the

process by which officers analyze; protect against tailoring and fraud.

> *DHS releases other similar documents in full; this undermines its claim that it will suffer*
> *harm if assessments are released in full*

### a.  Record of Determination

Some asylum applicants swim across the Rio Grande River and walk into Texas. They

are arrested and detained in a nearby facility, and are interviewed within a few days by asylum

officers.  The officer will ask "Did you suffer any harm in your country?" The decision made for

this applicant is titled "Record of Determination."   8 U.S.C. § 235(b)(1). This decision is handed

to the applicant. The applicant does not need to make a FOIA request for it. Plaintiffs seek

discovery about the Record of Determination: in Attachment E, Interrogatory #1, Plaintiffs ask if

there is a DHS employee who has personal knowledge of this document, and if Jill Eggleston has

any personal knowledge. DHS could answer this in 60 seconds.

### b. Notice of Intent to Deny [NOID]

Some applicants enter the United States as students, in the "F-1" category. They might be

in this status for years, until they get a B.A. or Ph. D.  A student, in good status, who applies for

asylum, is interviewed by a local asylum office. The officer will ask "Did you suffer any harm in

your country?" The decision made for this applicant is titled "Notice of Intent to Deny." This

decision is handed to the applicant. The applicant does not need to make a FOIA request for it.

A Notice of Intent to Deny is attached hereto as Attachment B. it contains facts, reasons,

citations to authorities, and conclusions. It is very similar to an Assessment. *See* the numerous

assessments behind Attachment A.

      c. Notice of Intent to Terminate [NOIT]

      Some applicants are granted asylum, but then [at times years later] DHS determines that

asylum should be terminated.  The asylum office makes a decision titled "Notice of Intent to

Terminate." The applicant "shall be given…the reasons therefor…" at least 30 days before the

interview. 8 C.F.R. section 208.24 (c).  The decision is handed to the applicant. The applicant

does not need to make a FOIA request for it. The Affirmative Asylum Procedures Manual, at

page 97, requires this notice to inform the applicant "of the grounds for termination, including

any regulation for each ground, and includes a brief summary of the unclassified supporting

evidence that constitutes grounds for termination. The Asylum Office must include at least one

evidentiary statement to support each ground presented on the NOIT. The Asylum Office does

not attach reports…but may summarize statements or findings from such documents as part of

the evidentiary statement."  At page 98, the Manual states that after the issuance of a NOIT, the

applicant may file a request of information in his file "pursuant to the Freedom of Information

Act."  *See* Attachment D.

      c.     Assessment to Refer

      The DHS used the Assessment to deport an asylum applicant named Singh in

*Singh v. Gonzales*, 403 F.3d 1081, 1087 (9th Cir. 2005). The Court attached a copy of

the Assessment as an Appendix to its decision. [It is also attached to this complaint as

Exhibit 1.]  The DHS did not file a motion to seal the record, so that the public would

not see the Assessment. After the decision was published, the DHS did not ask the

Court to delete the Assessment so that no one could read it. Assessments to Refer are

given to the applicant in Immigration Court.

Records of determination, Notices of Intent to Deny, and Notices of Intent to

Terminate contain information, that is disclosed to applicants. This shows the DHS

does not suffer harm. The information in these documents is similar to what is in

Assessments: so, release of assessments will not cause harm either.

*Asylum officers are instructed that many people will read Assessments; hence
they have no expectation of privacy*

Entire assessments were routinely released from 1998-2005. *See* Attachment A,

Declaration of David Cleveland dated October 13, 2020. An entire declaration for an applicant

from India is published at 403 F.3d 1081 (9th Cir. 2005). It has been there for the last 15 years. A

copy is attached to the Complaint: ECF No. 1-1.

Asylum officers are given training materials that state they are to use templates when

they write assessments and Notices of Intent to Deny [NOI]. They are instructed that

a long list of people have access to both documents. They are instructed that the

components of both documents are the same. *See* Attachment B and Attachment C.

The Affirmative Asylum Procedures Manual, at page 28, states that, concerning a

NOID, the applicants shall be given "the reasons" for the denial, and is allowed ten days to file a rebuttal. An applicant "must be provided the opportunity to review and respond to any Department of State (DOS) Bureau of Democracy, Human Rights and Labor (DRL) comments…[at times, the Notice of Intent to Deny] must cite to the use of the DOS DRL comment letter and note the specific information applied in reaching the adverse determination. A copy of the DOS DRL comment letter should be attached to the NOID for the applicant's reference." *See* Attachment D.

The DHS publishes an Affirmative Asylum Procedures Manual, available online. It states: "Nevertheless the Asylum Officer's Assessment may be disclosed to the applicant in response to a FOIA request..." *see* Attachment D.  That manual also states: "Where country conditions are relevant to the determination of changed circumstances, the assessment must contain a minimum of two country conditions citations supporting the finding…It is preferable that the two citations be from different sources…" at page 86, *see* Attachment D.

### C.  **Exemption 6 withholdings**

Exemption 6 does not apply to assessments.

### D-F.    **Exemption 7**

DHS does not contend that Exemption 7 applies to the four assessments.

## III. DHS HAS NOT RELEASED ALL REASONABLY SEGREGABLE INFORMATION

Plaintiffs argue that the entirety of all assessments should be released. In the event the Court does not agree, plaintiffs argue also that "sources of information" relied upon by the asylum office, should be released.

In the assessment dated December 10, 1998 [Exhibit 2], the asylum office relied upon a 1998 State Department report, a 1998 Amnesty International Report, and on a Freedom in the World Report. Exhibit 3, an assessment dated 11/18/02, relies upon the Panafrican News Agency, Daily Nation, the BBC, and a source found at www.cesnur.org.  This information is useful to the applicant: if asylum offices cite themselves to the Freedom in the World and to the BBC, then the applicant can do himself.

*The FOIA Improvement Act of 2016 added another provision about segregability*

Before the 2016 amendments, section 552(b), last ¶, provided:

"Any reasonably segregable portion of a record shall be provided to any person…"

The 2016 amendment added sub-section 552 (a)(8):

 "An agency shall . . . (I) consider whether partial disclosure of information is possible whenever the agency determines that a full disclosure of a requested record is not possible . . . and (II) take reasonable steps necessary to segregate and release nonexempt information." 5 U.S.C. § 552(a)(8)(A)(ii).

Thus, the current law requires agencies to segregate, not in just one section, but in two sections. This shows that Congress was serious about the duty to segregate.

This sub-section must be given effect. *See Stone v. INS*, 514 U.S. 386, 397, 115 S.Ct. 1537, 131 L.Ed.2d 465 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect.").

*Applicants had some rights taken away in 1997*

8 C.F.R. § 208.12(a), as of 1996, provided that officers may rely on material from

outside, "credible" sources. It also provided that:

> "Prior to the issuance of an adverse decision made in reliance upon such material, that
> material must be identified and the applicant must be provided with an opportunity to
> inspect, explain, and rebut the material, unless the material is classified under E.O. 12356.
> [*see* 62 FR 10312 (3/6/97).] "

§ 208.12(a) was amended in 1997: it no longer requires that any material be identified; it no

longer requires that the applicant be allowed to inspect, explain, or rebut the material. So, after

1997, and currently, an officer may rely upon material *not disclosed* to the applicant. The

applicant is no longer able to inspect, explain, or rebut that material. The applicant has no idea

what sources and materials were considered by the officer.

8 C.F.R. section208.12 (b) provides:

> Nothing in this part shall be construed to entitle the applicant to conduct
> discovery directed toward the records, officers, agents, or employees of the
> Service, the Department of Justice, or the Department of State. Persons may
> continue to seek documents available through a Freedom of Information Act
> (FOIA) request pursuant to 8 CFR part 103.

After the interview, the asylum officer is permitted, and encouraged, to do his own

research and fact-finding. The officer is not bound by Fed. R. Evid. 201(b) which refers

to facts capable of accurate determination by resort to "sources whose accuracy cannot

reasonably be questioned." Whatever facts, theories, or inferences garnered by the

officer are put into the Assessment without notice to the applicant. The applicant is not

given any opportunity to rebut such facts or inferences.

The asylum officer is not required to give a citation to the record in support of an asserted fact. Local Civil Rule 7(h) is not binding on the officer. *See* Perry *v. Shinseki*, 783 F. Supp. 2d 125, 131 (D.D.C. 2011). He is not required to create and establish a record.

The asylum officer is not constrained by Fed. R. Civ. P. 56(c) (The "party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record").

Asylum officers may rely on information from "credible sources." Which sources are credible, and which are not? Applicants would like to know, so they can cite or not cite from them. If a source is deemed not credible, an applicant may be able to convince an officer to change his mind, and accept information from it. The DHS will not suffer any harm if applicants find out what sources are deemed credible by officers and what sources are not. The DHS will benefit if it reveals what sources are deemed credible, because then applicants will cite from them more often. If applicants know what sources are good, they can tailor their own research accordingly.

> *The Department of Justice understands that if an Immigration Judge (IJ) considers evidence, he must give a copy of it to both sides.*

The DOJ has published proposed rulemaking: 85 FR 59692 at page 59699, RIN 1125-AA93. This would amend 8 CFR section 1208.12 "to allow an IJ to submit evidence into the record and consider that evidence, so long as the judge has provided a copy to both parties, which will give the parties an opportunity to respond or address the information appropriately."

If an Immigration Judge [IJ] must disclose evidence, so should an asylum office.

The Declaration of Ms. Eggleston does not mention sources of information. There is no evidence she considered such materials.

## IV.    LOUISE TRAUMA CENTER'S POLICY-OR-PRACTICE CLAIMS ARE WELL FOUNDED

Louise Trauma Center lacks standing, argues DHS in its Memorandum, page 40 of 41. DHS argues that plaintiffs "do not give any new reasons for disclosure…." *Id.* at 40.  Not true: Congress amended the FOIA, effective June 30, 2016, to add a new and "meaningful" burden: to show harm.  Also, the facts are different: the asylum officer, by checking boxes on a computer, creates the Referral Notice.

## V. DHS PROVIDED INADEQUATE TRAINING TO ITS FOIA PROCESSORS

The Fifth Cause of Action, entitled "Negligent and Inadequate Training" is set forth in ¶s 252-257 of the Complaint. ¶ 253 states "DHS failed to adequately train its FOIA processors. *See* Exhibit 6."  Exhibit 6 summarizes the 1,321 pages that DHS released, concerning its training in 2019.  ECF No. 1-6, at page 8, states THREE KINDS OF HARM: one of them is "release could cast a chilling effect upon open, frank and honest discussions…between subordinates and superiors…"

This is very sparse training.

*This training ignores new sub-section 8 of the FOIA*

Congress amended the FOIA, effective June 30, 2016, adding a new sub-section:

An agency may withhold otherwise exempt material only if it reasonably foresees "harm." 5 U.S. C. § 552 (a)(8)(A) provides that, even if a record is otherwise exempt, the agency shall withhold "only if" the agency "reasonably foresees that disclosure would harm to an interest protected by an exemption…"

In *Center for Investigative Reporting v. US. Dep't of Interior,* 2020 WL 1695175, *3 (D.D.C. April 7, 2020) the Court said this new sub-section creates "a heightened standard." To satisfy its obligations, the agency must "articulate both the nature of the harm and the link between the specified harm and specific information contained in the material withheld." *Id.* [citations omitted). The training provided by DHS does not discuss this element.

In *Judicial Watch v. U.S. Dep't of Justice,* 2020 WL 5798442 (D.D.C. September 29, 2020), the Court rejected the agency's assertion of foreseeable harm stating the amendment "provides a meaningful and heightened standard." *Id.* at *2. [cleaned up]. The agency must "identify specific harms…that it can reasonably foresee would actually ensue from disclosure of the withheld materials." *Id* at *3 "The question is not whether disclosure could chill speech, but rather if it is reasonably foreseeable that it will chill speech and, if so, what is the link between this harm and the specific information contained in the material withheld." *Id.* It is not enough for an agency to speculate that harm could result from disclosure. *Id.* It must "connect [] the harms" in a "meaningful way to the information withheld. In doing so, an agency must avoid the use of "nearly identical boilerplate statements" and "generic and nebulous articulations of harm." *Id.*

New sub-section 8 means that some deliberative material can be withheld, and that some may NOT be withheld. The release of some material may cause a specified harm; the release of other material would not. How to distinguish? The processor must be given training and explanation about this. Exhibit 1-6 shows that in 2019, the processors were given training about the law *before* the amendment. Exhibit 1-6 says to processors: if release "could" chill discussions, then the material "could" be deliberate. How are the processors to know when release actually would chill discussions?

Ms. Eggleston's declaration, ECF NO. 14-2, does not state that assessments contain discussions between two people. If assessments do not contain discussions, how would release of assessments chill discussions?

*Most of the theories asserted by Ms. Eggleston are not reflected in the training given to the FOIA processors.*

ECF No. 1-6 shows that the processors are told to consider the "chilling" effect on release. They are not told about 1] the need for DHS to protect the manner in which asylum officers prioritize information; 2] applicants would tailor information; and 3] applicants would engage in fraud. The fact that Ms. Eggleston's theories are not in the training material is further evidence that she has supplied a "litigation" declaration to the Court.

> *The training about segregation is inadequate, because it does not mention the various parts of an assessment*

One part of an assessment are the sources relied upon by the officer. The officer may cite to a particular State Department report, a particular BBC article, or a particular internet source. What harm would be caused if that information is released? There is no training on this issue. There is no discussion of this in the Declaration of Ms. Eggleston.

## VI. MS. EMUWA'S CLAIM, SET FORTH IN THE FIRST CAUSE OF ACTION IN THE COMPLAINT, IS WELL-FOUNDED.

The First Cause of Action, concerning Ms. Emuwa, begins at ¶ 217 of the Complaint, ECF. No. 1. She was born in Nigeria; suffered domestic violence, and was interviewed by the Arlington Asylum Office in 2018. ECF No. 1, ¶s 177-190. She seeks her entire Assessment.

The DHS Motion for Summary Judgment, ECF No. 14, does not mention "The First Cause of Action," and does not discuss the assessment of Ms. Emuwa in particular.

ECF No. 14-2, Declaration of Jill Eggleston dated September 30, 2020, states at ¶ 21

that the deliberative process privilege applies to something, and also that the "attorney-client" privilege applies. She does not say who the "attorney" might be. She does not mention the assessment of Ms. Emuwa.

### *The first sentence of ¶ 24*

The first sentence of ¶ 24, states that the assessment contains the analysis of "the asylum officer," and "that releasing the information that was redacted would chill or deter USCIS employees from engaging in the candid and frank discussions that are so important and necessary to the full and proper analysis and fair consideration of these asylum requests on the merits." Ms. Eggleston assumes that "discussions" were held. There very well may have been "discussions," but there is no evidence that there are "discussions" in the Assessment. If discussions were held, and then a document is written that does not mention the discussions, how does releasing the document "chill or deter" employees? Who are the "employees"? the use of the word "employees" suggests that someone, not asylum officers, are affected. Ms. Eggleston does not explain who they are.

### *The second sentence of ¶ 24 has four elements*

The second sentence of ¶ 24 states that "we also determined that revealing the internal deliberations and analysis of USCIS asylum and supervisory asylum officers could provide a bad actor with information that would allow him to tailor his asylum application and testimony in a favorable, but fraudulent, manner."

a.   This sentence says that the analysis of <u>two </u>persons are in the assessment: the officer and the supervisor. But sentence # 1 of the paragraph only mentions one. Part of the assessment is the analysis of the asylum officer, and another part is the analysis of the supervisor? They might disagree with each other? Ms. Eggleston is confused.

b.  "Information." One piece of information is sources of information the officer and/or supervisor relied upon, such as the *New York Times* or the *BBC*.  District court opinions contain "information," yet society has declared that opinions should be published and not kept secret.

c.  "Tailoring" Tailoring is a good thing. We like tailored suits and tailored briefs.

d.  "Fraud" Fraud is bad, but how does releasing information promote it? By this theory, district court opinions should not released either. Also, preventing fraud is not an "interest" protected by the FOIA.

*Foreseeable harm*

Ms. Eggleston states in ¶ 38 of her declaration that "a foreseeable harm analysis" was conducted. But she does not say what harm was considered, and who did the analysis. There are four sources inside DHS concerning harm: 1] the training given to processors in ECF No. 1-6; 2] the Eggleston declaration dated July 2015; Attachment BB; 3] the Eggleston declaration dated September 2018; Attachment CC; and 4] the Eggleston declaration of September 2020, ECF No. 14-2.   These four sources are inconsistent. If Ms. Eggleston is confused and inconsistent, so are her processors. The record is unclear as to what kind of analysis was done for the assessment of Ms. Emuwa.

ECF No. 14-1, at page 2 of 30, states the assessment of Ms. Emuwa is protected, because releasing it "would chill or deter USCIS employees." Nothing is said about tailoring, information, or fraud.

Ms. Emuwa suffered domestic violence in Nigeria. She wants to know why the asylum office ruled against her. She wants to know what sources of information the office relied upon. Her assessment is important and "particular." Ms. Eggleston does not mention anything in

particular about Ms. Emuwa in her declaration, ECF No. 14-2. If this document is released, what harm would DHS suffer? Ms. Eggleston has failed to satisfy new subsection (8)(A) of the FOIA.

### VII. MR. LUKUSA'S CLAIM, SET FORTH IN THE SECOND CAUSE OF ACTION IN THE COMPLAINT, IS WELL-FOUNDED.

The Second Cause of Action, concerning Mr. Lukusa, begins at ¶ 223 of the Complaint, ECF. No. 1. He was born in the Democratic Republic of Congo, has an anti-government political opinion, and was interviewed by the Arlington Asylum Office in 2019. ECF No. 1, ¶s 191-202. He seeks his entire Assessment.

The DHS Motion for Summary Judgment, ECF No. 14, does not mention "The Second Cause of Action," and does not discuss the assessment of Mr. Lukusa in particular.

ECF No. 14-2, Declaration of Jill Eggleston dated September 30, 2020, states at ¶ 21 that the deliberative process privilege applies, and also that the "attorney-client" privilege applies. She does not say who the "attorney" might be. She does not mention the assessment of Mr. Lukusa.

Her discussion is inadequate for the same reasons that her discussions of Ms. Emuwa's assessment is inadequate.

At page 27 of ECF No. 14-1, we find a reference to the assessment for Mr. Lukusa: releasing it would "chill or deter" employees. This reference does not mention "asylum officers" or "supervisory asylum officers." This reference says nothing about "fraudulent" activity in the future. Nothing about "attorney client privilege."

## VIII. MR. ALQARAGHULI'S CLAIM, SET FORTH IN THE THIRD CAUSE OF ACTION IN THE COMPLAINT, IS WELL-FOUNDED.

The Third Cause of Action, concerning Mr. Alqaraghuli begins at ¶ 229 of the Complaint, ECF. No. 1. He was born in Iraq; his father was a "Shia," his mother is "Sunni," and was interviewed by the Chicago Asylum Office in 2014. ECF No. 1, ¶s 203-207. He seeks his entire Assessment.

The DHS Motion for Summary Judgment, ECF No. 14, does not mention "The Third Cause of Action," and does not discuss the assessment of Mr. Alqaraghuli in particular.

ECF No. 14-2, Declaration of Jill Eggleston dated September 30, 2020, states at ¶ 21 that the deliberative process privilege applies, and also that the "attorney-client" privilege applies. She does not say who the "attorney" might be. She does not mention the assessment of Mr. AlQaraghuli.

Her discussion is inadequate for the same reasons that her discussion of the Emuwa assessment is inadequate.

At page 25 of ECF No. 14-1, we find the name "Mohammed Al Qaraghuli," but there is no reference to his assessment. At page 14 of ECF No. 14-1, we find a reference to an assessment and "chill or deter" employees, and to "sensitive law enforcement techniques," and Exemption b(7)(E).  Does DHS claim that "sensitive law enforcement techniques" are in the assessment of Mr. Alqaraghuli? This may be a typographical error. Nothing about tailoring, information, and fraud.

Mr. Alqaraghuli made a FOIA request in March 2020. *See* Defendant's Statement of Material Facts not in dispute, paragraph 14. DHS did nothing for over 20 working days. Plaintiffs filed the complaint in June 2020. Mr. Alqaraghuli is therefore deemed to have

constructively satisfied his administrative remedies. *Oglesby v. Dep't of Army,* 920 F.2d 57 (D.C. Cir. 1990).

## IX. MS. ALTANHUA'S CLAIM, SET FORTH IN THE FOURTH CAUSE OF ACTION IN THE COMPLAINT, IS WELL-FOUNDED.

The Fourth Cause of Action, concerning Ms. Alatanhua, begins at ¶ 217 of the Complaint, ECF. No. 1. She was born in China; is a Mongol and a Buddhist, and was interviewed by the Newark Asylum Office in 2019. ECF No. 1, ¶s 208-214. She seeks her entire Assessment.

The DHS Motion for Summary Judgment, ECF No. 14, does not mention "The Fourth Cause of Action," and does not discuss the assessment of Ms. Alatanhua in particular.

ECF No. 14-2, Declaration of Jill Eggleston dated September 30, 2020, states at ¶ 21 that the deliberative process privilege applies, and also that the "attorney-client" privilege applies. She does not say who the "attorney" might be. She does not mention the assessment of Ms. Alatanhua.

Her discussion is inadequate, for the same reasons that her discussions of the Emuwa assessment are inadequate.

At page 8 of ECF No. 14-1, we find a reference to the assessment for Ms. Alatanhua: releasing it would "chill or deter" employees. There is also a reference to "attorney work product privilege." The name of the attorney is not mentioned. There is no description of "ongoing" litigation involving Ms. Alatanhua. There is no description of "potential" litigation of her.

¶ 21 of ECF NO. 14-2 refers to "attorney client" privilege. There is no explanation why "attorney client" privilege in mentioned there, but "attorney work product" privilege is mentioned here in ECF No. 14-1. ECF No. 14 mentions both privileges! [at pages 29-30 of 41]

## X. THE FIFTH CAUSE OF ACTION IN THE COMPLAINT, "NEGLIGENT AND INADEQUATE TRAINING," IS WELL-FOUNDED.

The FOIA Improvement Act of 2016 created new and meaningful burdens on agencies. In response, agencies should train their FOIA processors to do what the law requires. DHS gave training in 2015; it repeated that training in 2019. It should have incorporated what the new law required into the 2019 training.

## XI. THE SIXTH CAUSE OF ACTION IN THE COMPLAINT, HARM TO LOUISE TRAUMA CENTER, IS WELL-FOUNDED.

¶ 261 of the Complaint states: "Louise Trauma Center is being forced to divert time and attention away from its goals to deal with the problems set forth in this Complaint. Its activities are being impeded. It is being forced to undertake expenditures in response to, and to counteract, the effects of the conduct of DHS."  The Louise Trauma has stated a well-founded cause of action.

CONCLUSION

The DHS motion for summary judgment should be denied. Ms. Eggleston is confused and inconsistent.

Dated: 0ctober 28, 2020

Washington, DC

Attorney for Plaintiffs

/s/ *David L. Cleveland*
David L. Cleveland
DC Bar # 424209
1220 L Street NW #100
Washington, DC 20005
[202] 812-8684    1949.david@gmail.com

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ) | |
| ) | |
| AMARA EMUWA, et al., ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 20-1756 (TNM) |
| ) | |
| UNITED STATES DEPARTMENT OF ) | |
| HOMELAND SECURITY, ) | |
| ) | |
| Defendant. ) | |
| ) | |

[PROPOSED] ORDER

   Upon consideration of the DHS motion for summary judgment, and of any opposition thereto,
it is
    ORDERED:  the motion is denied
.

Dated: _____        _____
                                  U.S. District Court Judge