# ATTACHMENT A

## DECLARATION OF DAVID CLEVELAND

## DATED OCTOBER 13, 2020

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMARA EMUWA, ET AL, )
)
Plaintiffs, )
)
v. ) Civil Action No. 20-1756 (TNM)
)
UNITED STATES DEPARTMENT OF )
HOMELAND SECURITY, )
)
Defendant. )

### Declaration of David Cleveland dated October 13, 2020

I am David Cleveland, counsel for plaintiffs in this case.

1. I graduated from law school in 1975. I worked at Catholic Charities from 1998-2020.

2. During the years 1998-2005, I made many FOIA requests for the entire asylum office assessments of asylum applicants, and the DHS released them, as a matter of course. Attached hereto, are a few of the many entire assessments that I received:

Exhibit 2 is an assessment dated December 10, 1998

Exhibit 3 is an assessment dated 11/18/02

Exhibit 4 is an assessment dated 7/31/01

Exhibit 5 is an assessment dated July 16, 1998

Exhibit 6 is an assessment dated January 18, 2000

3. But, US-CIS changed its policy in 2005 and stopped releasing assessments, on the ground that they were exempt.

4. During the years 2013 or 2014, I talked face-to-face with two former asylum officers. Both of them spoke to me on the condition that I would keep their identities secret and confidential. Each of them told me as follows, concerning the procedure in the asylum office:

A]: the asylum officer writes an Assessment, and gives it to his Supervisor. The Supervisor makes the officer re-write it, until it is perfectly in accord with the Supervisor's views. Then, the Supervisor initials it. So, in a real sense, the Assessment is written by the Supervisor. After the Assessment is finished, it is put into the applicant's file. No one else looks at the Assessment; it is the final decision of the agency.

B] then, the asylum officer sits at his desk, at his computer. He checks boxes on a computer, and the computer creates a document entitled "Referral Notice." He prints that document. So, the asylum officer, acting as a clerk-typist, creates and prints the Referral Notice. The Supervisor does not do anything. No one else besides the asylum officer is involved in the creation of the document. The Referral Notice does not contain any useful information; it is never introduced into evidence in Immigration Court.

C]: the declaration of Ms. Eggleston is misleading: she says that after the Assessment is created, that "USCIS" prepares the Referral Notice. She is suggesting that someone else, not the asylum officer, not the Supervisor, prepared the Referral Notice. She does not identify that person. She does not do so because the person does not exist.

= = = = = = = = = = = = = =

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on October 13, 2020.   /s/ David L. Cleveland
                                                      David L. Cleveland

# EXHIBIT 2

## ASSESSMENT TO GRANT ASYLUM

ALIEN     DATE: December 10, 1998

NA

CO

The applicant indicated that he is a 31-year-old male native and citizen of Bangladesh who entered the United States with fraudulent documents at JFK International Airport in New York, N.Y. on August 15, 1992.

The applicant claims he has been persecuted in the past by agents  
Bangladesh on account of his political opinion and fears that he

The applicant credibly testified that he was an active member of                                              en  
PA was a student and twice weekly delivered food and medicine                                                 aka  
to recruit new members to the Jatiyo Party (JP). PA recalled ma  
National Party (BNP) leaders came to the JP offices where PA v  
activists that the police would be sent to punish them all for mal  
government. PA recalls abuse and beatings of JP activists by police being common during the BNP government. PA was arrested at home in July 1992 when he was arrested by police in civilian dress who took PA to the Rhamatana police station where he was kept in a small cell with no ventilation and given little water and food. PA was beaten with clubs on his joints, to the point that he could barely walk, and with a strong light shown on his face. PA saw many other JP activists and leaders at the police station during his 11 day detention and PA believes he was only released because the jail was so crowded that the police wanted to bring new prisoners in for punishment like that given to PA. After his release, the JP general secretary recommended PA leave Bangladesh for his own safety. PA said that JP leaders arranged for him to be smuggled out of Bangladesh and to the U.S.. PA calls his family living in Bangladesh, and none of which have been members of the JP, about twice monthly and they reported efforts by BNP leaders and police to find PA after he left Bangladesh. PA feels he would still be vulnerable to attacks from such persons if he were to return although the BNP is no longer the ruling party.

The acts of repeated severe beating while in detention without charge or trial described by the applicant amount to past persecution on account of his political opinion. Thus the applicant has established that he is a refugee.

Country conditions in Bangladesh have not changed to such an extent that the applicant no longer has a well-founded fear of persecution if he were to return. Country conditions reports

1

indicate that as in previous years, political violence involving supporters of the main political parties, the ruling Awami League and the opposition BNP, continued. Violence, often resulting in killings, is a pervasive element in Bangladeshi politics. Demonstrators from all parties, and even within parties, often clash with police and with each other during rallies and demonstrations. The Awami League and opposition parties used armed violence and intimidation to disrupt their opponents gatherings and rallies. Opposition parties also used armed violence to enforce general strikes. See "Bangladesh" in: U.S. Department of State's Country Reports on Human Rights Practices for 1997; Amnesty International 1998 Report; Freedom in the World: 1997-1998.

The threat of persecution the applicant fears exists countrywide given that PA fears reprisals by police with nationwide scope and range of authority.

Thus, the applicant has established that he is a refugee. There are no mandatory or discretionary factors that make the applicant ineligible for asylum.

Assessment is to grant.

2

# EXHIBIT 3

## ASSESSMENT TO REFER

CLIE[...]                                    DATE: 11/18/02

NAME                                         ASYLUM OFFIC[...]

COUN[...]                                    REVIEWING SA[...]

LOCA[...]

The applicant indicated that she is a 38-year-old female native of Kenya and citizen of Kenya who entered the United States at Newark, NJ on 03/29/02 and was admitted as a B-2 and applied for asylum on 09/23/02 initially. Applicant has established her application was filed within one year of her last arrival in the United States.

The applicant fears that she will be harmed by munigiki on account of membership in a particualar social group, applicant is a family memeber of a person who rejected the mungiki.

The applicant testified that her father joined the mungiki in 1997. He advised the group on how to recruit members. He stopped affiliating with the group in August 2000 because the group began to support social customs such as FGM.

After her father stopped affiliating with the group, the mungiki began to pursue her family. In September 2000, her family's home was burned down. Members of the mungiki that were looking for her father abducted her while she was hiding in Loitokitok. She was beaten and raped by them.

She was told that her father was taken by the mungiki. She has not heard from or seen her father since September 2000.

Applicant indicated that when her neighbors reported that that her home was burned down by the mungiki, the police refused to investigate because there were no witnesses or evidence. When she reported that she was being chased by the mungiki to the police in 2000, she was told that that she did not have a case because there were no witnesses. She believes that the mungiki worked in conjunction with the police because the police did not investigate the burning of her home. In addition, the mungiki "act and say that they are above the law".

Subsequent to being attacked, applicant moved to Kahawa West, Nairobi, applicant did not have any further "face to face" contact with the mungiki. She believes that her family is still being sought by the mungiki because "everybody knows that they are still looking for them".

The applicant presented testimony that was believable, consistent, and sufficiently detailed. Therefore, she was found to be credible.

The events the applicant described amount to past persecution on account of membership in a particualar social group, applicant is a family memeber of a person who rejected the mungiki.

Although the applicant has shown past persecution on account of membership in a particular social group, a preponderance of the evidence establishes that the applicant could avoid future persecution by relocating to another part of the country in question and, under all the circumstances, it is reasonable for her to do so.

If a persecutor is not the government and is not government-sponsored, the applicant bears the burden to establish that he or she could not avoid persecution in his or her country by relocating, or that under all the

circumstances, it would be unreasonable for the applicant to do so. The Kenyan government views the Mungiki sect, as an upshot of a revolutionary society whose aim is to create lawlessness and political instability. A government crackdown on the sect was ordered by President Daniel Arap Moi. By most accounts, the authorities deal firmly with members of the group that break the law. See allafrica.com. "Kenyan Churches Alarmed By Spread of 'Mungiki' Sect" (Nairobi: Panafrican News Agency, 3 September 2000), [Internet] < URL: http://www.hartford-hwp.com/archives/36/249.html >. See "'Kenya's Outlawed Sect Members Arrested After Battling Police'"(Panafrican News Agency, November 13, 2000)- as reported on Center for the Study on New Religions (CESNUR) -[Internet] < URL: http://www.cesnur.org/testi/mungiki_007.htm#Anchor-49575 >; "'Kenya's Outlawed Sect Members Arrested After Battling Police'" (Panafrican News Agency, November 13, 2000)- as reported on CESNUR- [Internet] < URL: http://www.cesnur.org/testi/mungiki_007.htm#Anchor-47857 >;"'Five Mungiki members held'" ("Daily Nation-Kenya," October 30, 2000) ) - as reported on CENSUR- [Internet] < URL: http://www.cesnur.org/testi/mungiki_006.htm#Anchor-11481 >; "'Abong'o outlaws Mungiki meetings'" ("Daily Nation," October 26, 2000)- as reported on CENSUR- [Internet] < URL: http://www.cesnur.org/testi/mungiki_006.htm#Anchor-44867 >; Muthengi, Alice. "'Clampdown after sect strips women'" ("BBC," October 26, 2000) - as reported on CENSUR-[Internet]< URL : http://www.cesnur.org/testi/mungiki_006.htm#Anchor-35326 >.

Furthermore, after relocating within her country, applicant was able to live approximately a year and a half without further harm by the mungiki.

The persecution the applicant suffered in the past was not so severe as to provide compelling reasons to grant asylum in the absence of a well-founded fear of persecution, nor has the applicant established a reasonable possibility of suffering other serious harm.

The applicant failed to demonstrate that the persecution she fears exists throughout Kenya or that it is unreasonable for her to relocate within her country. An asylum applicant must show that the threat of persecution exists countrywide or that it is unreasonable for the applicant to relocate within her country to avoid future persecution.

For the foregoing reasons, the applicant is not eligible for asylum status in the United States. Assessment is to refer to the Immigration Judge.



# EXHIBIT 4

## REFERRAL ASSESSMENT

Date: 07/31/01

Asylum O

Reviewing

The applicant indicated that she is a 49 year-old female, native and citizen of Indonesia who entered the United States at New York on February 5, 2001 and was admitted as a B2 visitor and applied for asylum on June 5, 2001. Applicant filed within the one-year filing deadline.

The applicant fears that she will be harmed by the Indonesia-Malay citizens of Indonesia on account of her Chinese ethnicity.

The applicant testified that during the May 1998 riots, her beauty salon was burned down. On February 5, 1999, applicant and a friend were traveling in a pedicab when they were ordered to get out. Two native Indonesians robbed them of all of their money and valuables and held a knife to applicant's throat.

Applicant presented testimony that was believable, consistent, and sufficiently detailed and therefore the applicant is found to be credible. The events the applicant described and the harm the applicant fears are **not** found to have been on account of one of the five protected grounds. The robbery described by the applicant seems to be generalized street crime, and while applicant may have been chosen as a victim because of her Chinese ethnicity, there is no indication that the police or government were unwilling to assist her. Applicant chose not to file a report with the police because she was afraid to do so. The RIC received information from ICANET (Indonesian Chinese and American Network) in an e-mail dated March 28, 2001 (ICANET can be contacted through their website, http://www.icanet.org/), in response to a question about "Other everyday crimes against CI? [Chinese Indonesians], A: In general crimes are increasing everyday against anybody. Extortions against the ethnic Chinese Indonesian are commonplace and generally unreported."

As to the May 1998 riots, media reports indicate that a government-appointed investigative team concluded on November 4, 2000, that the May riots were orchestrated by pro-government militants, including rogue elements within the armed forces, aimed at justifying the imposition of emergency rule and keeping Suharto in power. (Keith B. Richburg, *Broken Lives, Washington Post Foreign Service*, December 23, 1998). Those affected were primarily, but not entirely, Chinese.

As of October 1999, a free and fair election installed a new government in Indonesia, and country conditions reports state that official policies towards the Indonesian Chinese have

actually improved.

> In January President Wahid issued Presidential Decree No. 6, which repealed the ban (passed in 1967) on the practice of Chinese religion (Confucianism), beliefs, and customs. Ethnic Chinese celebrated New Year's openly for the first time in over 30 years. ... The Government restricts the import of Chinese-language publications and music. There are seven locally-published Chinese language newspapers. In November a new independent television station, Metro TV, began broadcasting 2 hours of news in Mandarin per day. The program was the first Chinese-language television broadcast in the country since 1965. ... The Chinese language now may be taught, spoken, and printed, and private instruction in Chinese no longer is prohibited. Some universities, including the University of Indonesia, offer Chinese-language instruction. A number of private institutions openly offer courses as well. Chinese-language publications in the country no longer are banned. ... Authorities no longer are required to note a special code on the national identification card for citizens of Chinese extraction. However, some Sino-Indonesians have claimed that this practice continues. *See* U.S. Department of State, "Indonesia," *Country Reports on Human Rights Practices for 2000*, http://www.state.gov/g/drl/rls/hrrpt/2000/eap, accessed 8/1/01.

Given the recent change in government, it is not possible to say in which direction the official policy is heading, nor whether the new government will be able to control the crime rate. There is no indication at this date that the official policies will change.

There have been ongoing conflicts between Muslims and Christians in Indonesia, but these seem to be primarily in the Moluccan islands, and in general haven't worsened since the time of applicant's departure from Indonesia. Human Rights Watch. *World Report 2001* (New York: Human Rights Watch, December 2000), p. 203.

The applicant also claims to have a fear of future persecution. However, as explained above, the applicant has failed to show that the harm she fears is on account of one of the five protected grounds and that the government is unable or unwilling to protect him.

For the foregoing reasons, applicant is not eligible for asylum status in the United States. Assessment is to refer to Immigration Judge.

# EXHIBIT 5

## ASSESSMENT/REFERRAL MEMO

Applicant indicated that he is a 59 year-old native and citizen of Bangladesh who entered the United States without inspection on June 30, 1993 at Buffalo, NY.

By clear and convincing testimony and/or documentary evidence applicant has demonstrated that his last entry to the United States occurred on or about June 30, 1993. He is deemed to have filed a timely I-589.

Applicant based his claim for asylum on past persecution and a fear of future persecution on account of his political opinion (supporter of Awami League) and his religion (Christian).

Applicant testified that he worked as a banker for American Express Bank in Dhaka, Bangladesh since 1963 before started a construction company in 1978 up to 1988. Applicant stated that he attended Notre Dame and Sali Mullah colleges in Dhaka from which he received a degree in economics, political science and history in 1967. Applicant testified that he was a member of the Christian Cooperative Credit Union which he joined in 1963, the Hindu-Buddhist-Christian Unity Council which he joined in 1988, and the Bangladesh Christian Association which he joined in 1989. Applicant also testified that he was a supporter of the Awami League political party. Applicant claimed that he was once arrested with 9-10 others on October 10, 1992 when police broke up a demonstration in which Applicant and others were protesting against the Bangladesh National Party (BNP) in Dhaka. Applicant stated that he was detained for one week during which time he said he was tortured, hit with a big stick, punched and kicked every day. Applicant also testified that he was stabbed on January 16, 1990 on his way home from a church when approximately 5-6 young people attacked him. Applicant said that he later awoke at the hospital and was released on January 25, 1990 and that he reported the stabbing incident to the police the same day. Applicant said that he decided to leave Bangladesh in 1993 and that an agent arranged for Applicant to leave. Applicant fears that he will be killed by Muslim fundamentalists upon returning to Bangladesh because of his Christian religion.

Applicant presented testimony which was consistent, detailed, and believable. Therefore, his testimony was found to be credible.

In order to receive asylum, an asylum-seeker must show actual past persecution or a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group or political opinion. With respect to Applicant's claim of persecution on

A301

account of his religion, the incidents or the experiences that the applicant described, while regrettable, do not constitute harm amounting to past persecution because these events were not on account of a protected ground. Applicant was unable to establish that his assault by a group of young men was on account of any of the five grounds. Applicant merely testified that he was pulled from his vehicle by a group of young men and stabbed. He did not provide any other evidence to indicate that the group attacked him on account of one of the five grounds. The burden is on Applicant to show that he was persecuted on account of a protected ground. Applicant was unable to meet his burden.

Applicant was also unable to show that the Bangladeshi authorities were unwilling or unable to control Islamic fundamentalist groups. Applicant testified that after being released from the hospital, he reported the incident to the police who told Applicant that the matter would be investigated.

Further, applying the *Mogharrabi/Acosta* test for well-foundedness, the applicant was unable to establish that he has a well-founded fear of persecution upon returning to his home country. According to the US Department of State BDHRL, Bangladesh: Profile of Asylum Claims and Country Conditions, February 1998, "Minority religious communities in Bangladesh have generally been able to live and worship with relatively few difficulties. While Hindus and Christians stand out in a society which is completely dominated by Islam, they are nevertheless able to live, work and worship in Bangladesh with a minimum of difficulty." The report goes on to state that, "Islamic fundamentalism is not an important force in Bangladesh, partially because Bangladesh's political history has associated fundamentalists with the anti-independence movement." Therefore it is clear that the authorities are not inclined to persecute Applicant on account of his religion.

With respect to Applicant's claim that he was a supporter of the Awami League, his fear of returning is not objectively well-founded because the Awami league is currently in power in Bangladesh. According to Freedom in the World 1996-1997, Bangladesh, "The opposition Awami League won elections in June 1996, ending a two-year political impasse marked by partisan violence and paralyzing general strikes. Therefore, Applicant's support of the ruling party in Bangladesh does not give rise to a well-founded fear because the Awami League is not inclined to persecute people who supported them.

As Applicant has not met all four prongs of the *Mogharrabi/Acosta* test, the applicant is not eligible for refugee status in the United States.

Assessment is to refer this case to an Immigration Judge.

# EXHIBIT 6

## 1-YEAR FILING DEADLINE
## REJECTION ASSESSMENT

DATE: January 18, 2000
ASYLUM

CONCUR: [ ] YES
         [ ] NO

Applicant is a 26-year-old male, native and citizen of Burma, who entered the United States without inspection at Seattle, WA on May 31, 1999.

Applicant fears he will be persecuted by the Burmese Government (SLORC - State Law and Order Restoration Council - now called, SPDC - State Peace and Development Council) on account of his political opinion, membership in the CSU (Chin Students Union) and the CFC (Chin Freedom Coalition), support of the CNF (Chin National Front) and his Christian religion.

Applicant fled Burma (Myanmar) after he had been detained, interrogated and beaten by members of the Burmese military on three occasions, during which he was always accused of being an CNF member and/or supporter. Applicant then paid a broker 350,000 Kyats (Myanmar currency) to bring him to the U.S. Applicant left Burma on May 2, 1999, traveled to Seoul, Korea where he claims to have boarded a cargo ship named the "Hong Kong Senator". He wasn't sure if the ship was from Hong Kong or Korea. He was taken on board by a Filipino crewman in whose cabin he stayed for the rest of the trip. He arrived in the U.S. on May 31, 1999, waited on the boat a few hours until 8:00 p.m. then was walked off the boat by the sailor. The sailor than made a few calls and put Applicant on a Greyhound bus to Los Angeles. Applicant claims he didn't know how long the trip took but he thought he reached LA around noon the next day.

Country conditions in Burma (Myanmar) at present are not found to have changed in any significant way from what they were when Applicant arrived in the U.S. in May 1999. In general, "The SPDC maintained and intensified its restrictions on basic rights of free speech, press, assembly, and association. Political party activity remained severely restricted." And "The Government imposes restrictions on certain religious minorities, and restricts freedom of movement." Regarding treatment of ethnic minorities, "…the ethnic minority populations continue complain that their concerns have not been addressed adequately by the Government." And, "Even in areas pacified under cease-fire arrangements, forced labor, village relocations, and other infringements on the rights of ethnic minorities continue to be imposed by local army and insurgent commanders." ("Burma (Myanmar)", "Country Reports on Human Rights Practices - Vol. I", U.S. Department of State (Washington, D.C., April, 1999) p. 822.) Thus, from the record available, it is concluded that the sporadic fighting is still on-going at this time, much in the same manner as it was during Applicant's departure in September, 1998.

In considering an applicant's request for asylum in the United States, the Service must determine that applicant's eligibility to apply is within the regulations which govern the One Year Filing Requirement. Under those regulations, it is the burden of the applicant to prove, by "clear and convincing evidence" that the application for asylum was filed within one year of their last arrival in the United States. Although Applicant has claimed that the I-589 was filed in a timely manner, the Service finds that Applicant has failed to meet the burden of proof, because he failed to establish that fact by valid travel documents, or, in their absence, credible secondary documentary evidence or oral testimony. The applicant failed to produce any valid travel document or acceptable secondary evidence regarding their travel and date of entry.

This finding is based upon guidance from Asylum Branch Headquarters, dated May 27, 1998, HQ Memo (HQASM 120/9.7.1), which states: "In the complete absence of documentation of a lawful arrival/entry, and applicant's testimony must be very detailed and consistent to be considered credible. For those that filed on or before April 15, 1998, it is an applicant's burden of proving with a 'preponderance of evidence' that the date

of entry testified to is more likely than not to have occurred; for those who filed on or after April 16, 1998, applicant's have a higher evidentiary standard of proving with 'clear and convincing' evidence that the arrival/entry date was within one year of the I-589 filing.

Clear and convincing evidence is a standard of proof which requires more than the preponderance of the evidence standard applied in most civil cases, but less than the beyond a reasonable doubt standard used in criminal proceedings. The clear and convincing standard imposes a lower burden than the clear, unequivocal, and convincing standard applied in deportation and denaturalization proceedings because it does not require that the evidence be unequivocal or of such a quality as to dispel all doubt. We have defined clear and convincing evidence as 'that degree of proof though not necessarily conclusive, which will produce in the mind of the court a firm belief or conviction, or as that degree of proof which is more than a preponderance but less than beyond a reasonable doubt.' (Internal citations omitted), <u>Matter of Patel</u>, BIA Int. Dec. 3083 (1988).

Examples of the clear and convincing evidence submitted in <u>Patel</u> included affidavits which were detailed, internally consistent and plausible, and which contained explanations of how the affiants acquired knowledge of the facts set forth, and the facts set forth were corroborated by historical evidence.

Applicant was unable to provide any evidence of his identity. Applicant claimed an unrealistic travel time overall given the distance between Rangoon, Seoul and Seattle considering the speed of the average cargo ship. Applicant gave an even more unrealistic estimation of the bus travel time between Seattle and Los Angeles given that the shortest bus travel time from Seattle to LA per Greyhound Bus Lines is 25 hours and 5 minutes in duration. Applicant was also unable to name the country of origin of the ship on which he sailed.

Because Applicant's last arrival was on an unknown date applicant has the burden of showing, by clear and convincing evidence, that he filed his application within one year of his last arrival in the U.S., Applicant has not met that burden. His testimony lacked sufficient detail as to the length of time he spent in travel, description of the vessel on which he traveled and other travel descriptions. Applicant was completely lacking in documentation as to his travels and his identity. Applicant's testimony, country conditions, and applicable U.S. law do not indicate any changed circumstances which materially affect Applicant's eligibility, nor are there any extraordinary circumstances which would account for the filing delay.

Because Applicant has not met his burden to show that his I-589 was timely filed and there are no changed or extraordinary circumstances which would result in the application being excepted from the filing deadline, applicant is prohibited from filing for asylum and his application rejected under INA Sec. 208 (a) (2) (B) & (D) and 8 C.F.R. Sec. 208.4 (a).