UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMARA EMUWA, ET AL, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOMELAND SECURITY, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 20-1756 (TNM) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DHS MOTION FOR SUMMARY JUDGMENT

### Table of Contents

Table of Authorities……………………………………………………….2

Introduction…………………………………………………… ……6

The Declaration Of Cynthia Munita Is Insufficient…………………….  12

DHS Is Inconsistent When It Describes Assessments……………………30

DHS Releases Other Similar Documents in Full; This Undermines Its Claim That It Will Suffer Harm If Assessments Are Released In Full… .31

DHS Has Not Released All Reasonably Segregable Information……… .34

Conclusion…………………………………………………………….. 35

## Table of Authorities

CASES  [cases chiefly relied upon are marked with *]

*Abdramane v. Holder,* 569 Fed. Appx. 430, 434 (6th Cir. 2014)........................................8,21

*Abtew v. US. DHS,* 47 F. Supp. 3d 98, 113 (D.D.C. 2014)....................................................8

*Abusamhadeneh v. Taylor,* 873 F.Supp.2d 682 (E.D. Va. 2012)....................................9,27

*Aguilar v. Garland,* 861 Fed. Appx. 45, 46 (6th Cir. 2021) …………………………8, 20

*Amadis v. Dep't of State,* 971 F.3d 364 (D.C.Cir. 2020). …………………………………20

*Badasa v. Mukasey* 540 F. 3d 909 (8th Cir. 2008)...........................................................27

*\*Center for Investigative Reporting v. U.S. Customs and Border Protection,*

     436 F. Supp. 3d 90 (D.D.C. 2019)...........................................................................10, 13

*Citizens for Resp. & Ethics v. US Dep't of Justice,*

     538 F. Supp. 3d 124 (D.D.C. May 3, 2021)....………………………………………17

*Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d 854, 866 (D.D.Cir. 1980)............23

*Diaz-Ortiz v. Garland,* 2022 WL 92542 (1st Cir. Jan. 10, 2022) …………………………27

*DHS v. Thuraissigiam,* 140 S. Ct. 1959 (2020).....................................................................28

*DHS v. Regents of Univ. of California,* 140 S. Ct. 1891 (2020)..........................................31

*Friends of Animals v. Bernhardt,* 15 F.4th 1254 (10th Cir. 2021)....................................18

*Grace v. Barr,* 965 F.3d 883 (D.C. Cir. 2020)....................................................................7

*Huisha-Huisha v. Mayorkas,* 2021 WL 4206688(D.D.C. September 16, 2021)..................6

*Ido v. U.S. Att'y Gen.,* 480 Fed. Appx. 972, (11th Cir. 2012)................................................9

*In re R-S-J-,* 22 I&N Dec. 863, 872 (BIA 1990)................................................................8

*Jud. Watch v. U.S. Dep't of Justice,* 20 F.4th 49 (D.C. Cir. 2021) …………………………12

*Jud. Watch v. U.S. Dep't of State,* 2021 WL 3633611 (D.D.C. Aug. 17, 2021)................16

*Jud. Watch v. U.S. Dep't of Commerce*, 224 F.R.D. 261 (D.D.C. 2004)...........................17

*Jud Watch v. U.S. Dep't of Commerce,* 2020 WL 6939807 (D.D.C. Nov. 25, 2020).........22

*Jud. Watch v. U.S. Secret Service,* 726 F.3d 208 (D.C.Cir. 2013)........................................17

*Kapende v. DHS,* 2020 WL 2610873  (D.C.Cir. April 17, 2020).. .............................20, 30

*Kiakombua v. Wolf,*  498 F. Supp. 3d 1, 11-12 (D.D.C. 2020).................................................6

*Kisor v. Wilkie,* 139 S. Ct. 2400, 2417 (2019) ……………………………………………13

*Leopold v. U.S. Dep't of Justice,* 2021 WL 3128866 (D.D.C. July 23, 2021) …………...16

*Li v. Holder,* 745 F.3d 336 (8th Cir. 2014)...............................................................................9

*Lizhi Qiu v. Barr*, 944 F.3d 837 (C.A.9, 2019).......................................................................8,20

*Londrigan v. FBI*, 670 F.2d 1164 (D.C. Cir. 1981)...............................................................17

*Matter of Krynicki,* 983 F.2d 74 (7th Cir. 1992) ……………………………………………25

*Matter of O-F-A-S-,* 27 I&N Dec. 709 (BIA 2019) …………………………………………10

*Meeropol v. Meese,* 790 F.2d 942 (D.C.Cir. 1986)..................................................................17

*Metlife, Inc. v. Financial Stability Oversight Council,*

        865 F.3d 661, 675 (D.C. Cir. 2017)..................................................................................25

*Murugan v. Att'y Gen.,*10 F.4th 1185 (11th Cir. 2021)...........................................................10

*Negusie v. Holder,* 555 U.S. 511, 553-54 (2009).....................................................................6

*New York Times v. Office of Management and Budget,*

        531 F. Supp. 3d 118 (D.D.C. 2021)  …………………………………………………..17

*New York Times v. Dep't of Health &Hum. Serv.*

    513 F. Supp. 3d 337 (S.D.N.Y. 2021)...........................................................................18

*Nightingale v. U.S. CIS,* 333 F.R.D. 449, 453 (N.D. Cal. 2019)...................................................7

*Niz-Chavez v. Garland,* 141 S. Ct. 1474, 1485 (2021)................................................................7

*Oglesby v. U.S. Dep't of Army,* 79 F.3d 1172, 1176 (D.C. Cir. 1996)......................................14

*Padilla v. Kentucky,* 559 U.S. 356, 371, n. 11 (2010).. ……………………………………7

*Pavement Coatings Technology Council v. U.S. Geological Survey,*

    995 F.3d 1014, 1023 (D.C.Cir. 2021)...........................................................................23

*Pub. Emps. for Env't Resp. v. DHS,*

    2021 WL 5987008 (D.D.C. Dec. 17, 2021) ………………………………………….13

*Ramirez v. U.S. Immigration and Customs Enforcement,*

    2021 WL 4284530 (D.D.C. Sept. 21, 2021)..................................................................28

*Regalado v. Barr*, 830 Fed. Appx. 516, 518 (9th Cir. 2020). …………………………………8

*Reps.Comm. v. FBI,* 3 F.4th 350 (D.C.Cir. 2021)...................................................................11,15

*\*Reps. Comm. for Freedom of the Press v. U.S. Customs and Border Protection,*

    2021 WL 4843970 (D.D.C. Oct. 18, 2021)…………………………………………24

*Savage v. Dep't of the Navy,* 2021 WL 4078669 (D.D.C. Sept. 8, 2021)   …………...14

*Singh v. Gonzales*, 403 F.3d 1081 (9th Cir. 2005). …………………………   ………20, 33

*Sinani v. Holder,* 418 Fed. Appx 475 (6th Cir. 2011)..................................... ............21

*Stone v. INS,* 514 U.S. 386 (1995)........................................................... ...........35

*Texas v. Biden,* 20 F.4th 928 (5th Cir. 2021).................................................... ..........28

*Tod v. Waldman,* 266 U.S. 113, 119-120 (1924),.........................................................28

*Todorovic v. Att'y Gen.,* 621 F.3d 1318 (11th Cir. 2010) ……………………………27

*Trump v. Thompson,* 20 F.4th 10 (D.C. Cir. 2021)...................................................16

*U.S. Fish & Wildlife Service v. Sierra Club,* 141 S.Ct. 777 (2021).........................19

*White Coat Waste Project v. U.S. Dep't of Vet. Affairs,*

    443 F. Supp. 3d 176 (D.D.C. 2020)............................................................. 18

*Yu v. Holder*, 693 F.3d 294 (2d Cir. 2012). …………………………………… .21

*Zaya v. Garland,* 2021 WL 445422 (6th Cir. 2021)................................................9

*Zynovieva v. U.S. Dep't of State,* 2021 WL 3472628 (D.D.C. Aug. 5, 2021).......... 14

## INTRODUCTION

The declaration of Cynthia Munita, ECF No. 30-1, is insufficient, because it contains vague generalities and false statements. She did not consider the "age, content, and character" of each of the four assessments. She identifies a harm that is not relevant to the purposes of the FOIA.

Entire assessments are used against asylum applicants in court, causing real harm: they get deported. It is unfair for DHS to deny assessments during the FOIA process, and then to ambush applicants with them in Immigration Court.

## THE ASYLUM PROCESS

"'For almost a century, Congress has recognized that citizens of foreign states are sometimes forced to flee from persecution in their home countries, and it has been the policy of the United States government that this country ought to serve as a place of refuge for persons who are in such distress. *Kiakombua v. Wolf,* 498 F. Supp. 3d 1, 11-12 (D.D.C. 2020).' In keeping with this policy, Congress has codified various procedures governing [this process]. *Huisha-Huisha v. Mayorkas,* 2021 WL 4206688, at *1 (D.D.C. September 16, 2021)

Justice Thomas provided a summary of Congressional acts:

Congress has steadfastly condemned *all* acts of persecution. See 22 U.S.C. §§ 6401(a)(5)-(7) (noting that "Congress has recognized and denounced acts of religious persecution," which can be "severe and violent" and "particularly widespread, systematic, and heinous under totalitarian governments and in countries with militant, politicized religious majorities"); § 6401(b)(5) (announcing that it is the "policy of the United States" to "stan[d] with the persecuted"); § 501, 78 Stat. 1015 ("The Congress condemns the persecution of any persons because of their religion"); Refugee Act of 1980, § 101(a), 94 Stat. 102, note following 8 U.S.C. § 1521 ("The Congress declares that it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands").

*Negusie v. Holder,* 555 U.S. 511, 553-54 (2009)

The Supreme Court has displayed solicitude for asylum seekers, noting that "Asylum applicants must use a 12-page form and comply with 14 single-spaced pages of instructions. Failure to do so properly risks having an application returned, losing any chance of relief, or even criminal penalties. DHS, I–589, Application for Asylum and for Withholding of Removal." *Niz-Chavez v. Garland,* 141 S. Ct. 1474, 1485 (2021)

If the applicant is denied, he could be deported and "might well be killed" in his home country. *Padilla v. Kentucky,* 559 U.S. 356, 371, n. 11 (2010). "The stakes are high." *Grace v. Barr,* 965 F.3d 883, 887 (D.C. Cir. 2020). The D.C. Circuit has solicitude for asylum applicants, as indicated by its criticism of the government for arbitrarily changing its policies. "USCIS's failure to acknowledge the change in policy is especially egregious given its potential consequences for asylum seekers." *Id.* at 901. That Court also lamented that the government recently "severely circumscribed newly-arrived aliens' ability to seek asylum." *Id.* at 908.

*It Is Legal To Ambush The Asylum Applicant In Court With A Document He Has Never Seen*

There is no discovery in Immigration Court. *Nightingale v. U.S. CIS,* 333 F.R.D. 449, 453 (N.D. Cal. 2019).  Noncitizens "are at risk of having their applications for immigration benefits denied based on a statement or testimony considered to be inconsistent with a previous statement in the A-File." *Id.* at 454.

It is legal for the DHS to ambush the applicant in court, by introducing the entire asylum officer assessment into evidence. The Supreme Court has noted it is unfair to "ambush aliens with last-minute notices," *Niz-Chavez,* 141 S. Ct. at 1486, but no court has yet outlawed the current practice of DHS of ambushing asylum applicants in Immigration Court with assessments. The DHS offered an entire Assessment into evidence at the conclusion of the applicant's case in

*Abdramane v. Holder,* 569 Fed. Appx. 430, 434 (6th Cir. 2014). Counsel for the applicant objected, but the Immigration Judge admitted it anyway. An assessment was introduced into evidence in the middle of a hearing on May 23, 2016. *See* Exhibits C and D, attached hereto.

Entire assessments are used in Immigration Court to show the applicant lacks credibility, and hence does not deserve asylum. *In re R-S-J-,* 22 I&N Dec. 863, 872 (BIA 1990)("It may be necessary to present the testimony of the asylum officer before the Immigration Court, together with notes and other evidence of what was said under oath.")

Judge Amy Berman Jackson noted the harm an asylum applicant may face in Immigration Court in note 18 of her Opinion:

"The Court notes, though, that this case presents a unique situation where the document at issue may have significant repercussions for plaintiff if it is used at his immigration proceeding. Based on the potential significant impact that the document may have on plaintiff's immigration status, as well as the strong likelihood that the Assessment will be introduced at plaintiff's immigration proceeding and that such use would in fact waive the deliberative process privilege while simultaneously triggering the protection afforded to plaintiff by section 1229a(b)(4)(B), the Court encourages defendant to not delay in providing the Assessment to plaintiff if it ultimately decides it will be used in the immigration proceeding." *Abtew v. US. DHS,* 47 F. Supp. 3d 98, 113 (D.D.C. 2014).

Assessments have often been relied upon by appellate courts: *Aguilar v. Garland,* 861 Fed. Appx. 45, 46 (6th Cir. 2021); *Regalado v. Barr,* 830 Fed. Appx. 516, 518 (9th Cir. 2020). *Lizhi Qiu v. Barr,* 944 F.3d 837, 840 (9th Cir. 2019) (the phrase "asylum officer" is used 22

times); In *Li v. Holder,* 745 F.3d 336 (8th Cir. 2014), the applicant was interviewed by asylum officer Laurie Kuriakose. The Court mentioned "Kuriakose" 19 times in its opinion.

*Assessments contain mistakes at times*

Everyone makes mistakes. This includes asylum officers. If an applicant is ambushed with a document that contains a mistake, there will be confusion in the court. In *Zaya v. Garland,* 2021 WL 4452422, at *3 (6th Cir. Sept. 29, 2021) the asylum officer wrote down the wrong name and made "other mistakes."  The Eleventh Circuit noted an error in an Assessment in *Ido v. U.S. Att'y Gen.,* 480 Fed. Appx. 972, (11th Cir. 2012) (the year of the first arrest was written down in error). The applicant should be given the document before court starts, to give him a chance to challenge or rebut it.

*Mistakes in a FBI document led to a great waste of time for Mr. Abusamhadeneh*

Mr. Abusamhadeneh wanted to become a U.S. citizen, so he filed an application to naturalize. He was set to be interviewed by an officer in the US-CIS. That officer obtained and read a report from the FBI, that said Mr. Abusamhadeneh was a member of a certain organization.

When the officer interviewed Mr. Abusamhadeneh, she asked if he was a member of that organization. He denied it. So, the officer used that denial as evidence of the untruthfulness of the applicant, and denied his request to naturalize. Later, it was discovered that the FBI report was inaccurate. But, at the time of the interview, the officer did not know that. She had not given the report to the applicant; the applicant did not know of the report or of its contents. Only after a great deal of time and money had been spent, was Mr. Abusamhadeneh allowed to naturalize. *Abusamhadeneh v. Taylor,* 873 F. Supp. 2d 682, 6868 (E.D.Va. 2012).

What sources do asylum officers rely upon? Maybe those sources are inaccurate. Asylum applicants should be informed of evidence relied upon by officers.

*An asylum applicant must show "severe mistreatment" to win asylum*

To win asylum, the applicant must have suffered "severe mistreatment." *Matter of O-F-A-S-,* 27 I&N Dec. 709, 721 (BIA 2019) (being beaten and held in prison for five days is not enough). For another example of someone not suffering enough, and being denied asylum is Mr. Murugan. He was arrested and detained overnight. He was arrested again, tied to a chair, and interrogated for four days. Slapped, kicked, and threatened. Hospitalized for two days; attended mental health counseling because he had stopped eating and speaking. Arrested again and held for six hours. "These harms, while serious, do not rise to the level of persecution." Asylum denied.  *Murugan v. Att'y Gen.,* 10 F.4th 1185, 1193 (11th Cir. 2021)

DHS argues in this case that it will suffer "harm" if entire assessments are released. Plaintiffs ask the Court to bear in mind the harm suffered by Mr. O-F-A-S- and by Mr. Murugan in considering the evidence of DHS. Plaintiffs ask the Court to bear in mind the danger of torture and death that asylum applicants may suffer if they are deported.

THE DELIBERATIVE PROCESS PRIVILEGE IS BEING OVERUSED BY AGENCIES

Senate Report 114-4 and House Report 114-391 both show the "concern that agencies are overusing these exemptions to protect records that should be releasable under the law." *Center for Investigative Reporting v. U.S. Customs and Border Protection,* 436 F. Supp. 3d 90, 104 (D.D.C. 2019) There was a "growing and troubling trend of invoking FOIA exemptions *even though* no harm would result from disclosure." *Id.* at 104 [emphasis added]

"Congress was especially concerned about agencies' reliance on Exemption 5 and the deliberative process privilege. The Senate Report, for instance, noted that agencies had invoked Exemption 5 "more than 79,000 times in 2012—a 41% increase from the

previous year."  The House Report, similarly, pointed to "[e]xemption five ... as a particularly problematic exemption," and explained further that "[t]he deliberative process privilege is the most used privilege and the source of the most concern regarding overuse." H.R. REP. NO. 114-391, at 10

*Id.* at 104-05.

Congress desired that "the content of a particular record [w]ould be reviewed and a determination made as to whether the agency reasonably foresees that disclosing that particular document, given its age, content, and character, would harm an interest protected by the applicable exemption." S. REP. NO. 114-4, at 8. *Id.* at 105.

The D.C. Circuit repeated these concerns in *Reps. Comm. v. FBI,* 3 F.4th 350, 369 (D.C.Cir. 2021)("Congress was particularly concerned with increasing agency overuse and abuse of Exemption 5 and the deliberative process privilege.") So, Congress imposed new burdens on agencies. The agency must "articulate both the nature of the harm and the link between the specified harm and specific information in the material withheld." *Id.*  Perfunctory statements will not suffice. No more boilerplate.

"Instead, what is needed is a focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede those same agency deliberations going forward." 3 F.4th at 370.

Merely stating that if personnel knew their comments "would be released to the  general public, [they would] be less candid," is insufficient. 3 F. 4th at 370.

The Court used the word "particular" three times, at page 372: The agency must describe "each particular record." The agency must review the content of each 'particular record' sought and determine whether…disclosing *that particular document* would harm an interest.." The

agency must articulate the link between the harm and *specific information* contained in the material withheld." [emphasis in original]

The DC Circuit repeated its concerns in *Jud. Watch v. U.S. Dep't of Justice,* 20 F.4th 49, 53 (D.C. Cir. 2021)("Concerned that the government was overusing the [deliberative process] privilege, Congress passed the FOIA Improvement Act of 2016." )  The district court had ruled that attachments to emails to and from Attorney General Yates were deliberative, but the Circuit court reversed and remanded, instructing the lower court to apply the principles set forth in *Reporters Committee.* 20 F. 4th at 57.

**ARGUMENT**

**I.     THE DECLARATION OF CYNTHIA MUNITA IS INSUFFICIENT**

ECF No. 30-1 is a declaration from Ms. Cynthia Munita, Associate Center Director in Lee's Summit, MO.  She was appointed to her position less than two months before she signed her declaration. She was a public defender, a supervisor in the Customer Relations Division, and then a Field Office director in Seattle. She does not claim to have any experience in FOIA. She does not claim to have ever talked with an asylum officer, or with anyone from the Asylum Division.

She does not claim to have actually read the assessment for plaintiff Ms. Emuwa, or of the other three plaintiffs. She does not claim to have actually read any assessment, of any asylum officer, ever in her life.

An agency official may have special knowledge, or she may not. An agency involved in microbiology, for example, may have an employee with a Ph.D. and twenty years of experience in the field. The opinion of that person would have real value. Ms. Munita does not have special

knowledge. "That means, we have stated, that a court should decline to defer to a merely convenient litigating position, or *post hoc* rationalizations advanced to defend past agency action against attack." *Kisor v. Wilkie,* 139 S. Ct. 2400, 2417 (2019) (cleaned up).

*Ms. Munita does not discuss the "age, content, and character" of each particular document*

There are four assessments in this case, concerning plaintiffs from Nigeria, China, Iraq, and Democratic Republic of Congo. The plaintiffs are different genders, different religions, and each entered the United States at a different time.

As stated in Senate Report No. 114-4, at 8: the agency must consider the "age, content, and character" of each document. This language from the Senate Report was quoted in *Ctr. For Investigative Reporting v. US CBP,* 436 F. Supp. 3d 90, 105 (D.D. C. 2019). Language from the House Report was cited also, 436 F. Supp. 3d at 106: "[there must be] a specific, identifiable harm… and a link between the specified harm and specific information contained in the material."

Plaintiff Mr. Alqaraghuli arrived in the United States in January 2013, from Iraq. Any harm he suffered would be almost a decade old. What is the age, content, and character of his Assessment? What is the "specific information" in it, that would cause a harm? Ms. Munita does not tell us. She does not discuss this "particular" document.

Plaintiff Ms. Alatanhua arrived in the United States in 2015, from China. She is a Buddhist, and a member of the Mongol ethnic group. What content in her Assessment would cause harm? Ms.Munita does not discuss this "particular" document.

In *Pub. Emps. for Env't Resp. v. DHS,* 2021 WL 5987008, at *11 (D.D.C. Dec. 17, 2021) the agency official did describe the content of a record: the record contained environmental

"threats and hazards" that were only potential- they were not actually imminent. Revealing those threats might result "in members of the public taking action…where no action was warranted." The Court ruled that this description and linkage to a harm was sufficient to withhold disclosure.

The agency must also explain why release of the content would lead to a harm. In *Savage v. Dep't of the Navy,* 2021 WL 4078669, at *5 (D.D.C. Sept. 8, 2021), the agency failed to so explain. That case involved an African-American former naval officer, named Savage, who was removed from a training program. He alleged it was due to his race. The Navy then appointed a Navy Captain to investigate, and to write a report. That report was given to Vice Admiral Miller, who had the power to make a final decision. Savage requested a copy of the Captain's report. Held: the agency failed to make the necessary showing of harm. The Navy claimed that release of the information "would chill others within the Navy from being candid." The Court found that the Navy "does not explain why release of the particular information in this case would chill others within the Navy from being candid in the future." *Id.* at *6.

"In sum, the onus is on the agency to explain. with particularity, why disclosure would 'actually impede' future deliberations. *Reporters Committee,* 3 F. 4th at 370." 2021 WL 4078669 at *7.  Ms. Munita has failed to show this in her declaration. Her explanation " should reveal as much detail as possible as to the nature of the document, without actually disclosing information that deserves protection." *Oglesby v. U.S. Dep't of Army,* 79 F.3d 1172, 1176 (D.C. Cir. 1996). For another example of a deficient agency declaration, see *Zynovieva v. U.S. Dep't of State,* 2021 WL 3472628, at *5 (D.D.C. Aug. 5, 2021).  The declaration of the agency, written by Mr. Stein, was deemed insufficient, and was criticized for stating "in conclusory fashion" that the records were "relating to visas." The Court noted:

"[Mr. Stein] does not say, however, who reviewed the records to make that determination or what knowledge or experience that person brought to the task. He does not say whether that person reviewed the responsive records one by one to ensure that each record fell into one of the thirteen categories…"

*The Assessment of Mr. Alqaraghuli does not contain sensitive material*

Mr. AlQaraghuli was born in Iraq. He has an anti-government political opinion; he favors democracy and Western values. His father is "Shia;" his mother is "Sunni." He entered the United States in January 2013. He was interviewed by the Chicago asylum office in August 2014; the officer who interviewed him no longer works at that office. Complaint, paragraphs 203-204.

The factual portions of his Assessment have been released, but not the "analysis" portion. You can win asylum if you suffered harm in the old country, because of a special reason, such as your political opinion. If Mr. Alqaraghuli suffered harm, it was a decade ago. There is no evidence of 1] any "policy" being announced or determined in the document; 2] anything that is "high-profile;" or 3] anything that is forward-looking or, controversial. If there were "sources" cited in the Assessment, there is no evidence of any need to keep them secret.

DHS will not suffer any harm if the remainder of the Assessment is released. The Alqaraghuli assessment is far different from other documents, release of which might cause harm: *see Reps Comm. v. FBI,* 3 F 4th 350, 357 (D.C.Cir. 2021) (conversations about the implications of changing [FBI] undercover practices going forward." and emails during "a vigorous public debate, [Page 363] when the FBI "was under significant pressure from Congress." [Page 363]

In *Jud. Watch v. U.S. Dep't of State,* 2021 WL 3633611 (D.D.C. Aug. 17, 2021), the documents involved "sensitive legal issues" involving State Department monitoring of sources in The Ukraine; these were "high-profile and sensitive" matters. *Id.* at *6.

Furthermore, "there were substantive differences of opinion within the agency about how to proceed."*Id.* at *7. The matter was "controversial," and included "forward-looking recommendations." *Id.* at *8. The Alqaraghuli Assessment has none of these features.

 *Leopold v. U.S. Dep't of Justice,* 2021 WL 3128866, at *4 (D.D.C. July 23, 2021) was a "high-profile and sensitive" case involving Robert Mueller and the 2016 presidential election. There were congressional requests, and "senior Department decision-makers" had to respond. *Id.* at *5. This is far different from the Alqaraghuli Assessment.

Even if an agency claims that a document is "high-profile," there must be facts to back up the claim. The D.C. Circuit recently rejected the claims of former President Trump, in his attempt to shield documents from Congress, in *Trump v. Thompson,* 20 F.4th 10, 38-39 (D.C.Cir. 2021). The former president claimed documents concerned "complex and sensitive matters of foreign affairs;" but the Court held that "bare allegations" that were "unsupported by any plausible factual allegations" were insufficient. 20 F. 4th at 39.

If Cynthia Munita had read the Alqaraghuli Assessment, she could describe its contents to us. Failing that, the Court can read for itself the full Assessments that are part of the record, at ECF No. 1-1, at ECF No. 15-2, at Exhibits A and D attached to this brief. None of those assessments has anything sensitive in it.

*Ms. Munita's declaration relies too much on un-sourced hearsay*

To be sure, many courts have held that in a FOIA case, the agency declaration may properly include hearsay. *Meeropol v. Meese,* 790 F.2d 942, 951 (D.C.Cir. 1986). But, there have been exceptions: *Londrigan v. FBI*, 670 F.2d 1164, 1174 (D.C. Cir. 1981) (district court's grant of summary judgment reversed due to the affiant's lack of personal knowledge of the facts underlying the exemption and his reliance on hearsay); *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 224 F.R.D. 261, 264–65 (D.D.C. 2004) (court struck portions of the agency FOIA Director's declaration due to a lack of personal knowledge and impermissible hearsay). If a declaration is called into question by "contradictory evidence in the record," a court may demand more information. *Jud. Watch v. U.S. Secret Service,* 726 F.3d 208, 215 (D.C.Cir. 2013).

In *New York Times v. Office of Management and Budget,* 531 F. Supp. 3d 118, 129 (D.D.C. 2021) the Court discovered "statements of declarants who lacked personal knowledge, which were contradicted by other evidence of record;" therefore, the Court ordered that certain documents be released.

A recent case finding lack of personal knowledge to be critical is *Citizens for Resp. & Ethics v. US Dep't of Justice,* 538 F. Supp. 3d 124, 138 (D.D.C. 2021). In that case, the DOJ declarant, Ms. Brinkmann, "does not claim to have any personal knowledge of why the document was created or what its purpose might be, and while she states generally at the beginning of the declaration that she consulted with 'knowledgeable Department personnel,' she does not state that she spoke with any particular person to gain first-hand information about the provenance of this document." *Id.* at 138. Accordingly, the Court ruled that a document was not exempt.

Ms. Brinkman stated she consulted with knowledgeable Department personnel, but her declaration was still criticized. Ms. Munita does less than Ms. Brnkman: Munita does not claim to have consulted with anyone.

Another case finding lack of personal knowledge of a FOIA official to be critical is *New York Times v. Dep't of Health &Hum. Serv.* 513 F. Supp. 3d 337, 354 (S.D.N.Y. 2021). In that case, Mr. Merrell declared that participants had an expectation of privacy, but, "Merrell never explains how he knows that the 'participants' (whom he does not even define) had such an 'expectation' and does not assert that he has any personal knowledge of this fact."

Ms. Munita believes the asylum officers feel certain things. Why not ask the officers directly how they feel? The Tenth Circuit cited the lack of evidence of how some employees felt, in denying an exemption to an agency in *Friends of Animals v. Bernhardt,* 15 F.4th 1254, 1262-63 (10th Cir. 2021) ("In fact, FWS offers no evidence that the submitters themselves believe they have a privacy interest." [emphasis in original]"

Yet another case finding lack of personal knowledge to be important is *White Coat Waste Project v. U.S. Dep't of Vet. Affairs,* 443 F. Supp. 3d 176,189–90 (D.D.C. 2020), which involved requests about research on dogs at Veterans Affairs facilities in Richmond VA and in Milwaukee. The agency claimed that people displeased with dog research protested outside of the facilities, made harassing phone calls, and threatened the researchers. Therefore, to show the need to prevent physical harm in the future, and to show that certain records should be deemed exempt, the agency filed the declaration of a Dr. Fallon, who described the protests and threats. However, his declaration was deemed insufficient: he was located in Atlanta GA; the facilities were in other cities. The Court stated that Fallon was a person who "testifies about incidents without

explaining the basis for his personal knowledge…. Dr. Fallon fails to establish the basis for any personal knowledge of the incidents at McGuire VAMC and Milwaukee VAMC, as well as the incidents involving the researchers with no connections to the VA."

Ms. Munita says that asylum officers expect their assessments will be read only by persons inside the agency. Paragraph 11. She does not reveal who told her that. She does not claim an asylum officer told her that.

She says that bad actors would use information to do fraud. Paragraph 15. She does not reveal who told her that. Many assessments have already been disclosed, ECF No. 1-1, Exhibit A attached hereto, and see the five assessments at ECF No. 15-2.  She does not say that the release of those assessments resulted in fraud.

*Ms. Munita merely repeats boilerplate*

She says the assessments contain the "candid impressions" of asylum officers. And that the assessments contain "analysis, opinions, deliberation, and recommendations." Disclosure of this information would cause the officers "to no longer feel free to discuss their evaluations..in an open and frank manner." ECF 30-1, Paragraph 14. The officers would "temper their discussions" because of later publicity. Paragraph 14. This is insufficient, under *Reps. Committee,* 3 F. 4th at 370.

*U.S. Fish & Wildlife Service v. Sierra Club,* 141 S.Ct. 777, was decided in the 2021, but it dealt with a FOIA request written before 2016- before the FOIA was amended. Hence, that case does not discuss "harm."

Ms. Munita states that asylum officers analyze "testimonial and documentary evidence presented by the applicant," at paragraph 12, but she does not describe it. What is the

"evidence"?  Plaintiff Ms. Emuwa is from Nigeria; Ms. Alatanhua is from China. Certainly their evidence will be different from each other. Would disclosure of all evidence lead to harm? The factual portions of the assessments have already been revealed. What is Ms. Munita concerned about? Her vagueness and lack of detail distinguish this case from *Amadis v. Dep't of State,* 971 F.3d 364 (D.C.Cir. 2020). In that case, a suspected drug trafficker was denied a visa to enter the United States. The agency submitted a "thoroughgoing and detailed declaration, ECF No. 13-1, which "specifically focused on the 'information at issue….'" 971 F.3d at 371.

> *Ms. Munita incorrectly states that asylum officers expect that Assessments will be viewed  only by others within USCIS*

The second sentence of her paragraph 11 states: "Asylum officers reasonably expect that … their Assessments will be viewed only by those within USCIS…" [emphasis supplied]. Ms. Munita does not reveal who told her that.

1. Her statement is false. Assessments are viewed by many people outside of USCIS.

A copy of an entire Assessment is attached to the Complaint in this case, ECF No. 1-1. That Assessment is published in the appendix of  *Singh v. Gonzales*, 403 F.3d 1081, 1087 (9th Cir. 2005).   A copy of an entire Assessment was released in January 2020, mooting the case of *Kapende v. DHS,*  2020 WL 2610873 (D.C.Cir. April 17, 2021)[attached hereto as Exhibit A]

The Complaint, ECF No. 1, at paragraph 96, alleges: "During the time period 1998- to 2005, the DHS routinely disclosed Assessments to FOIA requesters." Five such assessments are in the record at ECF No. 15-2. Another public assessment is Exhibit D.

 Initialed Assessments have often been relied upon by appellate courts. For example, see: *Aguilar v. Garland,*  861 Fed.Appx. 45, 46 (C.A.6, 2021); *Lizhi Qiu,*  944 F.3d 837, 840 (C.A.9,

2019) *Sinani v. Holder,* 418 Fed. Appx. 475, (6th Cir. 2011); *Yu v. Holder*, 693 F.3d 294, 296 (2d Cir. 2012). The DHS offered an entire Assessment into evidence at the conclusion of the applicant's case in *Abdramane v. Holder,* 569 Fed. Appx. 430, 434 (6th Cir. 2014). Counsel for the applicant objected, but the Immigration Judge admitted it anyway.

2. Asylum officers are instructed that Assessments are read by many persons outside of the agency

*See* page 11 of *Decision Writing Part I,* dated June 21, 2004. Assessments may be given to the "applicant and his or her attorney.... [ The applicant and his attorney] "may submit a Freedom of Information Act [FOIA] request to obtain a copy of any assessment (and other information in the file)." ECF No. 18-5, at page 5 of 7.

ECF No. 18-5 lists more persons outside of USCIS, to whom are given assessments: ICE Assistant Chief Counsels, who at times give assessments to Immigration Judges; the Board of Immigration Appeals and federal courts; the Department of State, the FBI, contractors, and members of Congress.

Page 5 of 7 of ECF No. 18-5 also mentions "Congressional Liaisons" as persons who may have access.

The DHS publishes an Affirmative Asylum Procedures Manual, available online. It states: "Nevertheless the Asylum Officer's Assessment may be disclosed to the applicant in response to a FOIA request..." ECF No. 18-6, at page 4 of 7

Ms. Munita therefore is quite wrong when she says officers believe that only USCIS persons will read their assessments.

At times, employees are so concerned about future publicity that they resign. In

*Jud Watch v. U.S. Dep't of Commerce,* 2020 WL 6939807, at *6 (D.D.C. Nov. 25, 2020) one "scientist left the agency in part due to the contentious public scrutiny of his scientific deliberations." Thus, the agency legitimately feared harm in the future. But in the instant case, there is no evidence of any "contentious public scrutiny," and there is no evidence that even one asylum officer is concerned about anything.

*Enabling bad actors to commit fraud is not an interest to be protected by the FOIA*

At paragraph 15 of her declaration, Ms. Munita states that revealing the analysis of asylum officers "would provide bad actors with information that would allow them to tailor asylum applications and testimony in a favorable, but fraudulent manner." Even if this is true, this is not an interest protected by the deliberative process privilege.

5 U.S. C. § 552 (a)(8)(A) provides that, even if a record is otherwise exempt, the agency shall withhold "only if" the agency "reasonably foresees that disclosure would harm an interest protected by an exemption…"

Enabling fraud is not good, but that is not an "interest protected by" Exemption 5, which contains the deliberative process privilege.

That privilege 1] "serves to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism; 2] to protect against premature disclosure of proposed policies before they have been finally formulated or adopted; and 3] to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the

agency's action. " *Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d 854, 866

(D.D.Cir. 1980)

Protection against fraud is not one of the interests to be protected by the privilege.

*Ms. Munita does not explain how officers would behave differently in the future*

At paragraph 15 of her declaration, Ms. Munita hypothesizes that if officers knew

details were "publicly revealed,"  "the free flow of information" would be stifled. She

does not explain how she knows that. She does not explain why the flow of

information would be stifled. Asylum officers consider applicants from around the

world. Assume in the year 2022, an officer writes an assessment about a Buddhist

from China, and then in 2023, the officer begins to write an assessment about

someone fleeing domestic violence in Nigeria. Why would the officer be "stifled" in

2023? Ms. Munita does not explain. Her declaration is similar to the deficient

declaration in *Pavement Coatings Technology Council v. U.S. Geological Survey,* 995

F.3d 1014, 1023 (D.C.Cir. 2021): (The agency "does not say it will and does not

explain how, if these model runs are disclosed, scientists will cease to conduct model

runs in the future or do them differently.")

*Ms. Munita does not explain, or even give one example, of how information in one*

*assessment leads to fraud in a future case*

Ms. Munita does not describe anything in the Ms. Emuwa assessment that could

enable fraud by someone else. Ms. Emuwa, fleeing domestic violence in Nigeria, suffered

harm in that country before she arrived in the United States years ago. What is it in her

assessment that would enable fraud for an applicant, such as Mr. Lukusa, who fled the

Democratic Republic of Congo, who had suffered harm due to his political opinion?  The Court can read for itself the *Singh* assessment published by the Ninth Circuit, the assessment of Mr. Kapende, the five assessments at ECF No. 18-5. What is it in those assessments that enable fraud in a future case? Ms. Munita does not explain.

Ms. Munita's declaration is deficient for the same reasons as the declaration in *Reps. Comm. for Freedom of the Press v. U.S. Customs and Border Protection,* 2021 WL 4843970 (D.D.C. Oct. 18, 2021), In that case, the Court ordered the release of most of the challenged records. The Court criticized the agency declaration for merely restating the generic rationale for the entire privilege. This rationale "cannot meet the independent foreseeable harm requirement identified in *Reporters Committee*." *Id.* at *9. Furthermore, the communications were about minor matters: "nor do these communications concern anything like the undercover tactics discussed by the FBI in that case." *Id.* at*9.

One record contained the names of non-public-facing employees. The Court upheld the agency's showing of harm, because the agency's declaration "cites specific examples of harassment and threats against CBP employees. *See* Howard 4th Decl. ¶ 56. These examples explain in a "focused and concrete way" how disclosure of the names would harm CBP employees. *Reporters Committee*, 3 F.4th at 369. CBP has shown a risk of foreseeable harm.." *Id.*at *19.

Giving "specific examples of harassment and threats" is explaining in a "focused and concrete way" how harm would occur. In the instant case. Ms. Munita does not state any specific examples. She has shown nothing concrete. She just offers

speculation.

*An assessment is like a district court decision. It gives reasons, and cites to authorities.*

Civil Rule 52 requires trial judges to state Findings of Facts and Conclusions of Law. This promotes public confidence in the courts. Courts do not make secret rulings; they publish their decisions, so the parties may know how to appeal. A well-written decision may dissuade an appeal. Others can read the decisions, and plan their own affairs in accordance.

A trial judge might rule against a party, citing a statute of limitations. This educates other parties. A trial judge might rule against a criminal defendant because of no alibi witness. This educates other parties. A trial judge might rule in favor of a plaintiff, and cite the name of an expert witness. This educates other parties. Yes, it could be said that such decisions "enable fraud," but society has determined that public disclosure of decisions is a good thing.

*Metlife, Inc. v. Financial Stability Oversight Council,* 865 F.3d 661, 675 (D.C. Cir. 2017) instructs that "a fundamental norm of our judicial system [is that] that judges' decisions and their rationales must be available to the public. *See Matter of Krynicki*, 983 F.2d 74, 75 (7th Cir. 1992) ('Judges deliberate in private but issue public decisions after public arguments based on public records.').

Immigration judges and courts of appeals publish decisions concerning asylum applicants. This is a good thing. People then know how the courts are functioning. So too with asylum officer assessments. Publishing them is a good thing.

*US CIS recently released sources cited in an assessment for an applicant from*

*Sierra Leone. This voluntary act shows the agency suffers no harm upon such release*

Attached as Exhibit B to this brief is an assessment dated January 22, 2021, for an applicant from Sierra Leone. That assessment cites www.28toomany.org and www. Ecoi/net/en as sources. The fact of this voluntary disclosure shows the agency suffers no harm upon release of sources. It is easy to do. It provides useful information to asylum applicants and their lawyers. If someone is able to demonstrate that for some reason, those sources are unreliable, and then informs and convinces the agency of that, then the agency will benefit. The agency might stop using those sources.

*Ms. Munita did not explain how disclosure of sources or authorities cited in*

*assessments would result in harm*

Asylum officers are instructed to include in their assessments at least "two country conditions citations" where country conditions are relevant. ECF No. 18-6, at page 5 of 7.

Ms. Munita does not mention what citations were in the assessment for Ms. Alatanhua, the Buddhist from China who has a political opinion. Nor does Ms. Munita discuss citations in the assessment for Mr. Alqaraghuli, from Iraq.

Ms. Munita does not claim that anyone would suffer harm if citations were released.

It is a good thing to release citations. The wise asylum applicant would then cite them himself: if the asylum officer values *The New York Times,* or decisions from the Immigration Tribunal of Canada, then the applicant can cite them himself.

In the assessment dated December 10, 1998, ECF NO. 18-5, the asylum

office relied upon a 1998 State Department report, a 1998 Amnesty International Report, and on a Freedom in the World Report. The assessment dated 11/18/02 relies upon the Panafrican News Agency, Daily Nation, the BBC, and a source found at www.cesnur.org.  This information is useful to the applicant: if asylum officers cite Freedom in the World and to the BBC, then the applicant can do so himself. Exhibit A cites *Guidelines for Children's Asylum Claims.*[italics in original] Exhibit D cites an article from Human Rights Watch.

In this Court's decision of June 3, 2021, the Court noted the argument of plaintiffs: "DHS will suffer no harm if sources cited in assessments are released."  2021 WL 2255305, at *3. Ms. Munita does not respond to this; she has therefore conceded this point.

*What if a source is unreliable?*

An asylum officer might cite to a questionable source. Knowing this, the applicant might be able to convince the officer the source is not reliable. In *Diaz-Ortiz v. Garland,* 2022 WL 92542, at *21 (1st Cir. Jan. 10, 2022) the IJ relied upon a "Gang Assessment Database." This source was deemed unreliable, and the case was remanded. For another example, an Immigration Judge cited to Wikipedia in a decision: an appellate court then criticized that source and the IJ. *Badasa v. Mukasey*  540 F. 3d 909 (8th Cir. 2008). In *Todorovic v. Att'y Gen.,*621 F.3d 1318, 1326 (11th Cir. 2010) the IJ relied on impermissible stereotypes about gay people as a substitute for substantial evidence. If a source is revealed, the parties can comment upon it. This will lead to more justice and correct decisions.

In *Abusamhadaneh v. Taylor,* 873 F.Supp.2d 682, 686 (E.D.Va. 2012), an immigration officer relied upon a faulty FBI report to deny naturalization to an applicant. After the denial, the applicant found out about the FBI report and was able to convince the

agency that he in fact deserved naturalization.

In *Tod v. Waldman,* 266 U.S. 113, 119-120 (1924), an immigration official ignored a Jewish family's claim of religious persecution, believing that Judaism does not qualify as a "religion" under governing law.  Concurring Justice Breyer cited that case as a danger: what if "such officials denied a refugee asylum based on [a] dead-wrong legal interpretation [?]. " *DHS v. Thuraissigiam,* 140 S. Ct. 1959, 1989 (2020).  These cases show it is good to reveal the sources of adjudicators.

*Are asylum officers following their instructions?*

The officers are instructed to include at least two country conditions citations in each assessment. ECF No.18-6, at page 5 of 7. Are they doing that? If they are not, the public should know about it. Assessments should not be insulated from judicial review. In *Texas v. Biden,* 20 F.4th 928, 997 (5th Cir. 2021), the Court criticized the government for using logic that "would allow DHS to use the power to make, say, asylum decisions while ignoring every single limitation on those decisions imposed by the INA." The Court further criticized the government for suggesting its power was "completely insulated from judicial review. That would make DHS a genuine law unto itself." Officers must follow their instructions and training. Their failure to do so can lead to the granting of an injunction. *Ramirez v. U.S. Immigration and Customs Enforcement,* 2021 WL 4284530, at *8(D.D.C. Sept. 21, 2021) (immigrant children were mistreated upon arrival in the United States; ICE officials "attempted to circumvent its newly instituted reporting requirement;" the Court was concerned that officers "have not [yet] received any additional training….*12)

*The Department of Justice understands that if an Immigration Judge (IJ) considers evidence, he must give a copy of it to both sides.*

The DOJ has published proposed rulemaking: 85 FR 59692 at page 59699, RIN 1125-AA93.  This would amend 8 CFR section 1208.12 "to allow an IJ to submit evidence into the record and consider that evidence, so long as the judge has provided a copy to both parties, which will give the parties an opportunity to respond or address the information appropriately."

If an Immigration Judge must disclose evidence, so should an asylum officer.

*Ms. Munita shows her lack of knowledge by suggesting that the analysis of two persons is contained in Assessments*

At paragraph 15 of her declaration, Ms. Munita states: "Moreover, revealing the internal deliberations and analysis of USCIS asylum and supervisory asylum officers would provide bad actors with information…" This statement suggests that an assessment contains the analysis of two persons: the officer and his supervisor.  But elsewhere in her declaration, Ms. Munita says it is just one person who writes: "The Assessments..were prepared by the USCIS asylum officers…" Paragraph 9.  "Thus, the information withheld…were *only* the initial analysis…of the asylum officers." Paragraph 10, emphasis supplied.  "The withheld portions..reflect the asylum officer's analysis…" Paragraph 12.

Ms. Munita is confused when she suggests that comments of a supervisor are inside an assessment. This shows her lack of knowledge, and her readiness to repeat what someone else told her.

## II. DHS IS INCONSISTENT WHEN IT DESCRIBES ASSESSMENTS

The declarations of this agency change over time, regarding the exact same document. This suggests that instead of being based on facts from persons with actual knowledge, they are mere "litigation" declarations.

*Declaration of September 20, 2018, submitted in Kapende v. DHS*

In *Kapende v. DHS,* 2020 WL 2610873 (D.C.Cir. April 17, 2020), an asylum applicant submitted a FOIA request after the FOIA was amended in 2016. The applicant sought his entire assessment, and argued the agency would suffer no harm upon release. The agency claimed it would suffer harm, and furnished a declaration dated September 20, 2018, from Jill Eggleston. [ECF No. 15-8]. At ¶ 10, it reads:

> Public disclosure of the withheld information will lead to asylum applicants tailoring their applications and interview responses to what they believe will tip an asylum officer's decision in their favor. Public disclosure of the asylum officer's deliberative process will hinder the Agency's ability to make determinations solely on the merits of an asylum claim.

Ms. Eggleston is silent about the officers' expectation of privacy, about future fraud, and about the officers "tempering" their comments and not being "candid." She did not claim to have talked with an asylum officer.

*Declaration of September 2020, submitted in this case*

ECF No. 14-2 is a Declaration from Ms. Jill Eggleston, dated September 2020. At paragraph 39, she states that disclosure would "chill or deter" officers from engaging in "candid" discussions. She also states that disclosure would result in fraud. She does not claim that the officers have an expectation of privacy. She did not claim to have talked to an asylum officer.

*Declaration of Ms. Munita, ECF Nol 30-1*

Ms. Munita adds another theory in her declaration: that asylum officers believe that no one outside of USCIS will read their assessments. She does not claim to have talked to an asylum officer.

The above inconsistencies show that the agency declarations are merely "impermissible post hoc rationalizations." *DHS v. Regents of Univ. of California,* 140 S. Ct. 1891, 1908 (2020). They are no different from arguments by appellate lawyers. Ms. Eggleston and Ms. Munita do not claim to have any personal knowledge; they just repeat what someone else told them. They are not valuable sources of information.

## III. DHS RELEASES OTHER SIMILAR DOCUMENTS IN FULL; THIS UNDERMINES ITS CLAIM THAT IT WILL SUFFER HARM IF ASSESSMENTS ARE RELEASED IN FULL

Ms. Munita claims that "information" in assessments will lead to harm. She does not describe that "information," but presumably it includes reasons, conclusions, and sources of authority. The DHS voluntarily releases other asylum officer documents that contain reasons, conclusions, and sources of authority; no harm occurs there; why would harm occur here, when the same things are revealed? Ms. Munita does not explain.

The DHS has conceded this argument. In ECF NO. 21, at page 3 of 4, it stated: "The final agency decisions on asylum claims are given directly to an alien in their Record of Determination, Notice of Intent to Deny, and/or Notice of Intent to Terminate…." DHS does not argue that the contents of these documents are different from the contents of assessments.

    a.   Record of Determination

Some asylum applicants swim across the Rio Grande River and walk into Texas. They are arrested and detained in a nearby facility, and are interviewed within a few days by asylum officers.  The officer will ask "Did you suffer any harm in your country?" The decision made for this applicant is titled "Record of Determination."   8 U.S.C. § 235(b)(1). This decision is handed to the applicant. The applicant does not need to make a FOIA request for it.  This document gives reasons and conclusions to the applicant.

b. Notice of Intent to Deny [NOID]

Some applicants enter the United States as students, in the "F-1" category. They might be in this status for years, until they get a B.A. or Ph. D.  A student, in good status, who applies for asylum, is interviewed by a local asylum office. The officer will ask "Did you suffer any harm in your country?" The decision made for this applicant is titled "Notice of Intent to Deny." This decision is handed to the applicant. The applicant does not need to make a FOIA request for it. A Notice of Intent to Deny contains facts, reasons, citations to authorities, and conclusions. It is very similar to an Assessment.

c. Notice of Intent to Terminate [NOIT]

Some applicants are granted asylum, but then [at times years later] DHS determines that asylum should be terminated.  The asylum office makes a decision titled "Notice of Intent to Terminate." The applicant "shall be given…the reasons therefor…" at least 30 days before the interview. 8 C.F.R. section 208.24 (c).  The decision is handed to the applicant. The applicant does not need to make a FOIA request for it. The Affirmative Asylum Procedures Manual, at page 97, requires this notice to inform the applicant "of the grounds for termination, including any regulation for each ground, and includes a brief summary of the unclassified supporting

evidence that constitutes grounds for termination. The Asylum Office must include at least one evidentiary statement to support each ground presented on the NOIT. The Asylum Office does not attach reports…but may summarize statements or findings from such documents as part of the evidentiary statement."  At page 98, the Manual states that after the issuance of a NOIT, the applicant may file a request of information in his file "pursuant to the Freedom of Information Act."

     d. Assessment to Refer

     The DHS used the Assessment to deport an asylum applicant named Singh in *Singh v. Gonzales*, 403 F.3d 1081, 1087 (9th Cir. 2005). The Court attached a copy of the Assessment as an Appendix to its decision. [It is also attached to this complaint as Exhibit 1.]  The DHS did not file a motion to seal the record, so that the public would not see the Assessment. After the decision was published, the DHS did not ask the Court to delete the Assessment so that no one could read it. Assessments to Refer are given to the applicant in Immigration Court.

     Records of Determination, Notices of Intent to Deny, and Notices of Intent to Terminate contain information, that is disclosed to applicants. DHS does not claim it suffers harm when it discloses these documents. The information in these documents is similar to what is in Assessments: so, release of assessments will not cause harm either.

     Immigration Judges, the Board of Immigration Appeals, and appellate courts publish their decisions, which contain facts, reasons, citations to authorities, and conclusions. The DHS does not suffer harm as a result. Assessments contain the same elements; DHS will suffer no harm upon their release.

## IV. DHS HAS NOT RELEASED ALL REASONABLY SEGREGABLE INFORMATION

Plaintiffs argue that the entirety of all assessments should be released. In the event the Court does not agree, plaintiffs argue also that "sources of information" relied upon by the asylum office, should be released.

This is easy to do. And, the DHS recently did it. In the assessment dated January 22, 2021, attached as Exhibit B, two sources are disclosed: www.toomany.org and www. Ecoi.net.

In the assessment dated December 10, 1998 [Exhibit 2], the asylum office relied upon a 1998 State Department report, a 1998 Amnesty International Report, and on a Freedom in the World Report. Exhibit 3, an assessment dated 11/18/02, relies upon the Panafrican News Agency, Daily Nation, the BBC, and a source found at www.cesnur.org.

Exhibit A, the *Kapende* assessment, cites *Guidelines for Children's Asylum Claims.* Exhibit D, an assessment dated April 9, 2014, cites Human Rights Watch.

Ms. Munita does not explain why the sources in the assessment for Ms. Emuwa should not be released. Nor does she explain why sources in the other three assessments of the plaintiffs shouldn't be released.

*The FOIA Improvement Act of 2016 added another provision about segregability*

Before the 2016 amendments, section 552(b), last ¶, provided:

"Any reasonably segregable portion of a record shall be provided to any person…"

The 2016 amendment added sub-section 552 (a)(8):

"An agency shall . . . (I) consider whether partial disclosure of information is possible whenever the agency determines that a full disclosure of a requested record is not possible . . . and (II) take reasonable steps necessary to segregate and release nonexempt information." 5 U.S.C. § 552(a)(8)(A)(ii).

Thus, the current law requires agencies to segregate, not in just one section, but in two sections. This shows that Congress was serious about the duty to segregate. This sub-section must be given effect. *See Stone v. INS*, 514 U.S. 386, 397, 115 S.Ct. 1537, 131 L.Ed.2d 465 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect.").

CONCLUSION

The DHS motion for summary judgment should be denied. Ms. Munita's declaration is insufficient.

Dated: January 30, 2022

Respectfully Submitted,

Attorney for Plaintiffs

/s/ *David L. Cleveland*
David L. Cleveland
DC Bar # 424209
1220 L Street NW #100
Washington, DC 20005
[202] 812-8684    1949.david@gmail.com

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>AMARA EMUWA, et al.,</td><td>)</td><td></td></tr>
<tr><td align="right">Plaintiffs,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td align="center">v.</td><td>)</td><td>Civil Action No. 20-1756 (TNM)</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>UNITED STATES DEPARTMENT OF</td><td>)</td><td></td></tr>
<tr><td>HOMELAND SECURITY,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td align="right">Defendant.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
</table>

[PROPOSED] ORDER

Upon consideration of the DHS motion for summary judgment, and of any opposition thereto, it is ORDERED:  the motion is denied.

Dated: _____      _____
                                                U.S. District Court Judge